### HULL COAL & COKE CO. v. EMPIRE COAL & COKE CO.

(Circuit Court of Appeals, Fourth Circuit. February 5, 1902.)

#### No. 414.

1. CONTRACTS—CONSTRUCTION—QUESTION FOR COURT.

   The construction of a contract in writing is a matter of law for the court, and it is immaterial at whose suggestion particular clauses were inserted.

2. SAME—PERFORMANCE BY PARTY CLAIMING DAMAGES—NECESSITY.

   A party suing for breach of a contract containing mutual dependent agreements must show a perf..rmance on his part.

3. SAME—STIPULATION QUALIFYING GUARANTIES.

   A provision that the usual strike clause shall mutually govern in a contract for the purchase of all the coke manufactured by the seller during a fixed period (the latter guarantying a specified amount; the price, time of payment, and quality of the coke being agreed upon) qualifies only the guaranties that the purchaser will take all the coke manufactured, and that the seller will furnish a. specified amount, during such period.

4. SAME—STRIKE CLAUSE—SUSPENSION OF DELIVERIES—EFFECT.

   A provision in a contract for the purchase of all the coke manufactured by the seller during a fixed period (the latter guarantying a fixed amount; that in case of strikes, accidents, or other causes causing stoppage in the works of the seller, deliveries under the contract may be "suspended") relieves the seller from the obligation of its guaranty, where such causes have prevented it from furnishing the guarantied amount during the specified time, for the word "suspended" does not mean "postponed," and therefore the purchaser cannot demand delivery of coke, to make up the deficiency, after the expiration of the fixed period.

5. SAME—TIME—ESSENTIAL ELEMENT.

   In a contract for the purchase of all the coke manufactured by the seller during a fixed period, time is an essential element, because of the fluctuations in the market, and the life of the contract must be limited to the time fixed by the parties.

**6. SAME.**

Where the intention of the parties to limit a contract to a certain period is manifest, time is of the essence of the contract.

**7. SAME—CONSTRUCTION—GENERAL RULES.**

The subject-matter and purposes of a contract, and the situation of the parties to it, are material to determine the intention of the parties and the meaning of the words used; and, where these are ascertained,, they prevail over the dry words used.

**8. SAME—BREACH BY ONE PARTY—REPUDIATION BY THE OTHER.**

Where a buyer in a contract for weekly shipments of coke for a fixed period failed to pay on the 20th of the month for the coke received during the preceding month, as required by the terms of the contract, the seller might repudiate the contract; the latter not being in default.

**9. SAME—CONDUCT CHANGING TERMS OF CONTRACT—SUFFICIENCY.**

The terms of a contract for the purchase of all the coke manufactured by the seller for a fixed period, the seller guarantying a specified amount, are not changed by the buyer sending to the seller orders for delivery of coke in excess of the specified amount, where such orders are received in due course of business, but are not accepted.

In Error to the Circuit Court of the United States for the Southern District of West Virginia.

Lucian H. Cocke and Malcolm Jackson (A. J. Reynolds, on the brief), for plaintiff in error.

L. A. Anderson and G. E. Price (Rucker & Anderson and Flournoy, Price & Smith, on the brief), for defendant in error.

Before GOFF and SIMONTON, Circuit Judges, and PURNELL, District Judge.

PURNELL, District Judge. Plaintiff brought its action on the case in assumpsit, claiming $10,000 damages for breach of contract. The Hull Coal & Coke Company, plaintiff below, a corporation with its chief office at Roanoke, Va., was engaged in purchasing and selling coal and coke in Virginia and West Virginia. The Empire Coal & Coke Company, defendant below, a corporation with its chief office at Landgraf, W. Va., was engaged in mining coal and manufacturing coke. On November 19, 1898, the plaintiff addressed a letter to the defendant, which was afterwards accepted, and mutually agreed should be a contract between them. This letter was as follows:

"We make you the following proposition for the purchase by us of all the coke you can make at your ovens at Landgraf, W. Va., from January 21st. 1899. to December 31st, 1899: We guaranty to give you orders enough to keep all of your ovens—one hundred (100)—running full. You to guaranty to furnish not less than twenty thousand (20,000) net tons of coke during the above-mentioned time. Orders and deliveries of coke to be made in as nearly as possible equal weekly installments. Price to be one dollar and sixteen cents per net ton, f. o. b. cars at ovens. Settlements to be made in cash on the 20th day of each month for shipments of the previous month. The usual strike, accident, and transportation clauses to mutually govern. Coke to be of standard quality, and you to ship no coke to others than ourselves, except as covered by attached memorandum. Your acceptance of this letter to constitute a contract between us."

It is agreed that the following was the usual strike, accident, and transportation clause referred to, or that part applicable to this controversy:

113 F.—17

"In case of strikes, accidents, deficient transportation, or other cause, unavoidably causing stoppage or partial stoppage of the works of the manufacturer of this coke or its shipment, or in case of strikes or accidents unavoidably causing stoppage or partial stoppage of the works of the buyer, deliveries herein contracted for may be suspended or partially suspended, as the case may be, or, at the option of the party not in default, may be immediately canceled during the continuance of such interruption, by immediate notice to that effect given to the other party."

The Hull Coal & Coke Company made requisition upon the Empire Coal & Coke Company for coke to the capacity of the ovens, and in excess of the guarantied output of 20,000 tons; and the defendant company failed to furnish the amount,—only furnished during the period contemplated by the contract 14,572 tons and 1,100 pounds, which was 5,427 tons and 900 pounds less than the 20,000 tons called for in the contract; and it is claimed that, acting on the faith of the contract, the plaintiff below (appellant) had made sales of the coke which it had purchased, and, in order to meet its obligations, purchased coke at $2.50 per ton, being $1.34 per ton in excess of the price under the contract; and, for the damages thereby caused, this suit was brought. The Empire Coal & Coke Company relied on several defenses; i. e., the failure on its part to furnish the amount of coke guarantied by it was due to deficient transportation, a strike among its employés, a severe drought, which prevented it from securing the necessary water to manufacture the coke, and because plaintiff failed and refused to pay for the November delivery by the 20th of December. Under the ruling of the trial court these defenses were deemed sufficient, and under the instructions of the court there was a verdict for defendant.

It is conceded the Empire Company shipped to the Hull Company all the coke manufactured at its ovens, except that covered by the memorandum referred to, and under the strike clause the defendant was excused from deliveries at the particular times it failed to make such deliveries. The record does not disclose any complaint by or difference between the parties until December. The contract was executory, dependent on mutual agreements, containing guaranties, all governed by the strike clause as applicable. It can make no difference who suggested the strike clause, as argued. The contract is what the parties agreed to, and, being in writing, the construction is a matter of law for the court. Under a contract dependent on mutual agreements, the party alleging and claiming damages for a breach must allege and prove he has complied with his agreement and discharged his obligations. These are fundamental principles, which it is well to observe and keep in mind in considering the contentions in this case. What did the parties contract to do? Plaintiff agreed to purchase all the coke defendant could make at its 100 ovens from January 21, 1899, to December 31, 1899; to give orders enough to keep ovens running full; to make orders in as nearly as possible equal weekly installments; to pay $1.16 per net ton f. o. b. cars at the ovens in cash on the 20th day of the month for shipments of the previous month. Defendant agreed to furnish all the coke it could make, except as noted in memorandum attached, not less than 20,000 net tons of standard

quality during the time specified. Plaintiff was a dealer—a middleman—securing a market for coke. Defendant was a manufacturer. The stipulations were important to the business of each. The defendant had no coke ovens at Roanoke, and there was no market for coke at Landgraf. The manager of each corporation understood the business it was engaged in, and also the difficulties which might arise in connection therewith. Strikes, accidents, and deficient transportation are not uncommon obstacles in this branch of business, and other contingencies which might arise were well understood. Hence the strike clause was adopted to "mutually govern." To govern what? Not the price of coke, for that was fixed. Not the character of the coke, for that was also fixed at standard quality. Not the time of settlement, for that was to be on the 20th day of each month for shipments of the previous month. Why, then, insert this clause? Evidently to qualify the guaranties,—that of the plaintiff to give orders to keep all the ovens (100) running full, and the defendant to furnish not less than 20,000 tons, net, during the time specified. The second paragraph of the strike clause has no application, as the defendant was to deliver the coke f. o. b. cars, and paid no freight. This strike clause is a form used by the Hull Company in dealing with its customers, which it would be difficult to apply fully to the contract. Some of the stipulations have no application. This, however, does not affect the contention of the parties as presented by the record. A strike did occur; also an unavoidable accident, a drought in September, and a deficiency of transportation. There does not seem to have been any complaint on the part of the plaintiff of a failure to ship coke during the year, though for every month except May the shipments were short of the orders. About December 1st a correspondence by letter and telegram was commenced, plaintiff seeking to obtain a similar contract for coke for 1900 at an advanced price. About the 8th of December a disagreement as to whether, under the contract, coke should be shipped after December 31st, arose; but the negotiations for a new contract continued until December 23d, when defendant canceled the contract because plaintiff had not paid on the 20th for November deliveries, and no shipments were made after this date. The contract was limited to the product of the ovens, and was expressly limited to such product from January 21 to December 31, 1899, and was so treated by both parties until December 8th, when the contention arose. That plaintiff regarded the contract as so limited is shown by the proposition to obtain or enter into a new contract for the purchase of coke after December 31st. Plaintiff contended the word "suspended," in the strike clause, should be construed "postponed," and shipments not made within the time should be made after December,—in short, that the guaranty of 20,000 net tons was absolute. The authority cited for this contention is not in point, does not sustain it, and we cannot take that view. The two words are not synonymous, and the presumption is the parties understood the meaning of the words used. Norrington v. Wright, 115 U. S. 188, 6 Sup. Ct. 12, 29 L. Ed. 366, cited, and the following case in the same volume (Filley v. Pope, 115 U.

S. 213, 6 Sup. Ct. 19, 29 L. Ed. 372), not cited, applicable to another branch of the case, are not in point as to this contention, but against it. In both cases it is held:

"In a mercantile contract, a statement descriptive of the subject-matter or some material incident, such as the time or place of shipment, is ordinarily to be regarded as a warranty or condition precedent, upon the nonperformance of which the party aggrieved may repudiate the whole contract."

Time may be an essential element in a contract, as in the case at bar. It is well known that coke fluctuates in price. When the contract was made it was $1.16 at the ovens. At the end of the year it was worth $2.50 in the market, and plaintiff on December 20th declined to accept a proposition to contract for the sale of its entire output at the ovens in 1900 at $2.24 f. o. b. cars at ovens, but offered to enter into such contract at $2.75 per ton, etc. Time is therefore of material importance in this class of contracts, both as to sales, delivery, and payments. Other business transactions of the parties for the year were dependent on the time element of the contract. Knowing this, the parties fixed the time within which the contract was to be operative, and to put a different construction on it would be to ignore the language of the contract itself, and the evident intention of the parties when it was made. That plaintiff subsequently made contracts with other parties in which losses were incurred cannot affect the construction of this contract. Defendant possibly lost, too, by being compelled to deliver coke at $1.16, when the market price was much above that amount. There is nothing in the contract or strike clause which can reasonably be construed as extending the deliveries beyond December 31, 1899. Where the intention of the parties to limit a contract to a certain period is manifest, it is of the essence of the contract. Carter v. Phillips (Mass.) 10 N. E. 561; Scarlett v. Stein, 40 Md. 512.

The subject-matter of the contract, its purpose, and the situation of the parties, are material to determine their intention and the meaning of words used. When these are ascertained, they must prevail over the dry words used. Kauffman v. Raeder, 108 Fed. 171, 47 C. C. A. 278, 54 L. R. A. 247; Fox v. Tylor, 109 Fed. 258, 48 C. C. A. 356. The authorities cited in these cases are numerous. It is clear, considering these material matters, what the intention was,—to limit the sale to the output of the ovens for a specified time, and to modify the guaranty of defendant to deliver not less than 20,000 tons by the strike clause. Hence there was no error in the following instruction of the trial judge, to which plaintiff excepted, and which is assigned as error:

"Under the contract, the defendant was obliged to deliver to the plaintiff all the coke the defendant could make at its ovens at Landgraf, W. Va., from January 21 to December 31, 1899, except what it was allowed to furnish to others by the terms of the contract, and covered by memoranda attached to said contract, but that the defendant was not obliged to deliver any coke under said contract after December 31, 1899. That defendant guarantied to furnish not less than 20,000 tons during said period, but said guaranty was modified by what is called the 'Strike Clause' in said contract; and if the jury believe from the evidence that the defendant, by the exercise of

due diligence, was unable to make as much as 20,000 tons of coke at its said ovens during said period, by reason of stoppage or partial stoppage of its works by any or all of the causes hereinafter mentioned, and that it did make and furnish to plaintiff all that it could make at said ovens from January 21 to December 31, 1899, but at times during said period its works were stopped or partially stopped by a strike, by deficient transportation, by lack of water caused by a long-continued drought of such extraordinary severity that it could not have reasonably been anticipated or provided against, or by other unavoidable cause, then the defendant is relieved from liability under its guaranty for such quantity of coke as it was prevented from furnishing by reason of the stoppage of its works by any or all of the causes aforesaid."

Another exception pressed in the argument was as to the right of the defendant to cancel the contract on December 23d for the nonpayment of November deliveries. As before said, negotiations commenced about the 1st of December for a contract for coke; deliveries to begin on January 1, 1900. On December 8th the manager of the Empire Company wrote to the Hull Company that he was advised that by December 31st the entire amount of coke under the contract, except the deliveries prevented by causes within the relief stipulated in the contract,—the strike clause,—would be made, and offered to sell the Hull Company the output of the ovens for 1900 at $2.75 per net ton, etc. Plaintiff claimed the entire amount guaranteed had not been delivered, but should be delivered after, if not before, December 31st, but continued the negotiation for the 1900 product. The November deliveries were not paid for on the 20th, as provided in the contract; the reason alleged being because the Empire Company denied any obligation to deliver any coke after December 31st, and such claim was a breach of the contract. On the 23d of December, allowing three days of grace, the defendant canceled the contract on account of the plaintiff's failure to pay. Was this sufficient cause for refusing to pay according to the stipulation? The obligation to pay for the deliveries of the previous month by the 20th was a plain obligation of plaintiff. It is familiar law that under an executory contract, dependent on mutual obligations, the party asking damages must allege and show he has discharged his obligation,—is not in default. This was a contract for weekly shipments, which were made,—true, not in as great quantities as ordered, but, as has been seen, this shortage was not complained of, was provided for by the strike clause, and for the particular times condoned by plaintiff, if they amounted to a breach,— and for monthly payments. All the provisions of the contract were important to the parties. Defendant needed the money in its business, and that it should have it on the 20th day of the month was an express stipulation. Contracts of this nature are not governed by the same rule as simple debts, where the measure of damages is interest from the day the debt, whether bond or other form, is due. The day of payment is an essential element in the contract. The supreme court, in a recent case (Roehm v. Horst, 178 U. S. 1, 20 Sup. Ct. 780, 44 L. Ed. 953), held, quoting the rubric:

"After a careful review of all the cases, American and English, relating to the anticipatory breaches of an executory contract by the refusal of one party to it to perform it, the court holds the rule laid down in Hochster v.

De la Tour, 2 El. & Bl. 678, is a reasonable and proper rule. That rule is that, after the renunciation of a continuing agreement of one party, the other party is at liberty to consider himself absolved from any further performance of it. The parties to a contract which is wholly executory have a right to the maintenance of the contractual relations up to the time of performance, as well as a performance of the contract when due."

The other rulings refer to the question of damages. This is conclusive. The authorities cited in the brief sustain this view. Reybold v. Voorhees, 30 Pa. 116; 1 Whart. Cont. § 580; Coal Co. v. Coxe, 19 R. I. 380, 35 Atl. 210; Norrington v. Wright, 115 U. S. 188, 6 Sup. Ct. 12, 29 L. Ed. 366; Rugg v. Moore, 110 Pa. 236, 1 Atl. 320; Keeler v. Clifford, 165 Ill. 544, 46 N. E. 248.

This was a deliberate failure to pay, not an inadvertence, because of a dispute as to the construction of the contract; not a breach, either actual or alleged, on the part of defendant. Even if plaintiff's contention had been correct,—that deliveries not made on account of strikes, drought, and deficient transportation were postponed, only,—it is not claimed there had been a breach of the contract by the defendant. Under these circumstances, the Empire Company had the right to cancel the contract; and there was no error in the charge of the court that if the plaintiff failed to pay the defendant on or before the 20th day of December, 1899, and up to the 23d of that month, for the coke furnished it by the defendant in the month of November, 1899, and has not yet paid for the same, then the defendant had the right to cancel the contract, and if the defendant did so cancel the contract on the 23d day of December, 1899, and notified the plaintiff thereof on that day, then the plaintiff cannot recover of the defendant any damages for failure to deliver any coke to it after said 23d day of December, 1899.

The other assignments of error are to the refusal of the court to give instructions asked by plaintiff which present reverse views to those heretofore considered and passed upon. Only one not herein decided which was pressed on the hearing and in the brief, as to the refusal of the court to give an instruction asked for, to the effect that, if defendant accepted orders for the deliveries of coke in excess of the 20,000 tons, then as to such orders it could not avail itself of the exemption provided for by the strike clause. This instruction was properly refused. Defendant company was under no obligation to ship coke to plaintiff, except under the contract, and there is no evidence to support the idea that the orders sent were accepted. The mere fact the plaintiff gave orders apparently in excess of the capacity of the ovens could create no obligation aliunde the contract. The guaranty was that it would give orders sufficient to keep the ovens running full. It bought the entire product of defendant's ovens, except as specified, and, it is conceded, received it. No ex parte act of either party could create any new obligation, and the evidence does not show any acceptance of these orders,—merely that they were received in due course of business. This could not deprive either party of rights under the contract, and the instruction asked for is inconsistent with other instructions of plaintiff,—the relief afforded by the strike clause, as herein decided, which was, in express terms, made a part

of the contract. This strike clause was furnished by, and is conceded to be the one used by, the plaintiff in dealing with its customers, and its terms are more applicable to such dealings than to those involved in the case at bar. If plaintiff followed its custom, and used this clause in the contracts for the sale of coke purchased from defendant, it then can avail itself of the protection therein afforded. It has the same protection under this clause. It can avail itself of the same defenses. It had it in its power to protect itself against strikes, deficient transportation, and unavoidable accidents well understood in its business. If it did so, the misfortune complained of is imaginary. If it failed to do so, or elected to not avail itself of its defenses, it was its own oversight in the one instance, and choice in the other.

There is no error. Affirmed.

SIMONTON, Circuit Judge (concurring). Under the contract in the record, the plaintiff agrees to purchase all coke defendant can make between January and 31st December, 1899. Defendant guaranties within that time to make not less than 20,000 tons. Deliveries and orders to be made weekly. If defendant could make the 20,000 tons within the time specified, and did not make it, there would be a breach of the contract. If the defendant could not make 20,000 tons, this is a breach of the guaranty. It seems that defendant could have made 20,000 tons, and did not make it. Is it protected by the strike clause? The causes mentioned in this strike clause did stop the manufacturer for a time. In this event the deliveries could be suspended; that is, cease temporarily, to be resumed when the cause of suspension was removed. What effect did this have on the total delivery? All the output of the plant—all the coke the defendant could make within the time specified—was purchased by plaintiff. If the weekly deliveries were suspended in whole or in part for causes within the strike clause, just as soon as they were resumed the whole output—all that could be made—belonged to plaintiff, under the contract of purchase. So none of it could be used by the defendant to make up any deficiency. This would be impossible, as the contract was that the plant must during this period be run to its full capacity, for the benefit of plaintiff, and it was entitled to all that could be made. If this be so,—that when the deliveries were suspended the deficiency could not be made up,—then the causes mentioned in the strike clause prevented the output of 20,000 tons within the period limited. This clause certainly excused the nondelivery in the weekly installments. The failure to deliver these weekly installments prevented the delivery of 20,000 tons in the time specified. Nothing is said in the contract of any delivery after 31st December. On the contrary, the contract applies only to the output between January and December 31st. Suppose that coke had fallen in price, and that, when 31st December came, by reason of the causes in the strike clause there was still 6,000 tons to be made to make up 20,000 tons; could the defendant compel plaintiff to take these 6,000 tons at the contract price, greatly above the market price? It cannot be said that plaintiff

could protect itself by canceling the contract. This cancellation must be during the continuance of the suspension. It appears, then, that the defendant contracted to deliver in weekly installments all the coke its plant could make, running full, between January and 31st December, 1899, guarantying that it would deliver at least 20,000 tons. The strike clause justified the suspension of the weekly deliveries. The deficit of such suspension could not be made up out of the subsequent output, because the plaintiff was entitled to all that could be made. Therefore the cause mentioned in the strike clause prevented the delivery of 20,000 tons, and excused its nondelivery. And as the contract applied only to the output up to 31st December, the deficiency could not be supplied by any output after that time.

For these reasons, I concur in the opinion of the court.