### EDWARD MAURER CO., Inc., v. TUBELESS TIRE CO.

(District Court, N. D. Ohio, E. D.   April 26, 1921.)

No. 10215.

Sales ⊂=85(2)—Law making performance of contract at the time specified impossible discharges both parties under contract provisions.

Contracts for the sale of rubber, to be delivered during stated months, made during war time, when government regulations respecting importation and sale of rubber were anticipated, contained a provision that "this contract is subject to all the rules and regulations imposed by the United States government." *Held* that, where such regulations were made, which rendered performance by either party impossible at the times fixed for deliveries, the effect was not merely to suspend the contracts, but that both parties were discharged from any obligation thereunder, and that neither could demand or enforce delivery after such regulations were withdrawn.

At Law.   Action by the Edward Maurer Company, Incorporated, against the Tubeless Tire Company.   Judgment for defendant.

Willis Bacon, of Akron, Ohio, for plaintiff.

Clan Crawford and Squire, Sanders & Dempsey, all of Cleveland, Ohio, for defendant.

WESTENHAVER, District Judge.   In this case the parties have by stipulation in writing waived their right to a jury trial, and the issues were tried to the court.   A request is made for findings of fact, which request is granted and such findings will be made upon compliance with district court rule 34.   In this memorandum, such facts only will be stated as are necessary to a decision of the questions of law.

Plaintiff's action is to recover damages for the alleged refusal of defendant to accept and pay for certain rubber yet undelivered upon two contracts.   The first contract was made May 3, 1918, and the second May 14, 1918.   Both are in the same form, except as herein noted.   By the first, plaintiff agreed to sell and deliver 40 tons.   Deliveries were to be made in equal monthly installments in May, June, July, August, September, October, November, and December, 1918. By the second, plaintiff agreed to sell and deliver 5 tons, deliveries to be made in June and July, 1918, and shipments from the Far East at seller's option.   The terms of payment in both were cash against documents, and if payment was not made within 15 days from date of invoice, interest was to be paid at the rate of 6 per cent. per annum.   The controversy arises under a clause which in the first contract is in these words:

"This contract is subject to all the rules and regulations imposed by the United States government.   This contract is made subject to the rules of the Rubber Association of America, Incorporated.   This contract is subject to fórce majeure, strikes, and other causes and delays beyond seller's control. Any import duty or tax imposed by the United States government on crude rubber to be for account of buyer."

In the second contract appears the same clause, with these added words:

"Buyers agree to furnish seller with manufacturer's import license. Subject to granting of import license by the United States government."

Plaintiff shipped on its first contract May 23, 1918, 4,505 pounds, and June 11, 1918, 17,048½ pounds, both of which shipments were received and accepted by defendant and payment promptly made. On September 27, 1918, plaintiff shipped 11,204 pounds, which defendant refused to accept, and which was afterwards returned to plaintiff, and resold by it at a loss of 4 cents a pound. These shipments were made from the so-called free rubber. No further deliveries were made under either contract.

When the first contract was made, the parties knew that the United States government, through the War Industries Board, contemplated fixing a maximum price and restricting the importation of rubber from overseas, and that such regulations might be announced at any time. On May 7 these regulations were promulgated. Such rubber as was then in the United States, or on the high seas en route to the United States, was left free for sale and delivery; but the regulations required the consumer or manufacturer of rubber to obtain and furnish to the importer what is called an allocation certificate, in order to import any additional rubber. In other words, plaintiff was not permitted to import any new rubber for delivery under either of these contracts, unless defendant obtained an allocation certificate from the War Industries Board authorizing the defendant to buy and use it.

The allocation of rubber among manufacturers was made on the basis of their consumption of rubber during the preceding year, and inasmuch as defendant's plant was during that period in the construction and experimental stage, defendant was able to obtain an allocation of only 180 pounds a month. Plaintiff could not obtain rubber to be delivered except by importation. As a result of the regulations plaintiff was therefore unable to obtain rubber to deliver, and the defendant was unable to buy and pay for it, while these regulations were in force because it was unable to obtain allocation certificates. The restrictions were lifted December 13, 1918, and by the latter part of March or April, 1919, plaintiff had imported rubber and was then in a position to make further deliveries. Formal tender was made in June, 1919, and acceptance was then refused. At the time of such tender and refusal, and continuously thereafter until the bringing of this action, the price of rubber was 40 cents a pound; that is, 22 cents less than the contract price under the first contract, and 20 cents less under the second contract. This action is to recover plaintiff's damages, measured by this difference between the market price at the time of tender and the contract price.

Plaintiff's contention is that both contracts, properly construed, merely suspended or postponed the time of delivery during the period the rules and regulations imposed by the United States through the War Industries Board prevented the importation of rubber for delivery and sale. Plaintiff does not contend, as I understand it, that the inter-

ference of the United States government was not of such a nature as to excuse both parties from performance while these regulations were in force. In fact, plaintiff invokes the existence of these regulations, and relies upon their validity to excuse it from the consequences of its default or failure to make deliveries at the time required by its first contract. It is the second, and not the first, contract which imposes upon the buyer the obligation to furnish the seller with a manufacturer's import license. If plaintiff were not thus excused, its failure to deliver under its first contract, in equal monthly quantities as agreed, would constitute a breach upon its part, which would not only bar its right of action, but would have subjected it to an action for damages.

In view of the fact that both parties rely on this interference, and assume the validity of the governmental regulations to excuse them from default while such regulations were in force, it becomes unnecessary to examine carefully the authority of the War Industries Board to fix a maximum price and to restrict dealing in rubber. This position of plaintiff is a concession that these regulations were such an interference by law as excuses performance while they were in force. In passing, I may say that I am of the opinion that those regulations were the creation by the law of a condition which made performance impossible while they were in force, and therefore excused performance during that period. This was not merely the making of performance more difficult as a result of war or war conditions, such as is referred to in authorities relied on by plaintiff as not excusing performance. See Page on Contracts, § 1373, and illustrative cases cited therein; The Kronprinzessin Cecilie, 244 U. S. 12, 37 Sup. Ct. 490, 61 L. Ed. 960; Metropolitan Water Board v. Dick, Kerr & Co., Appeal Cases, H. of L. 119, [1917] 2 K. B. 1; Roxford Knitting Co. v. Moore & Tierney (2 C. C. A.) 265 Fed. 177. See also discussion of question in Columbus Ry., Power & Light Co. v. City of Columbus (D. C.) 253 Fed. 499, and opinion, 506–508.

We come, then, to plaintiff's main contention, that these contracts, properly construed, merely postponed or suspended delivery during the period that performance was prevented by governmental interference, and that when the restrictions were removed, the contract remained in full force and effect, with an obligation upon the plaintiff thereafter to deliver, and upon the defendant to accept and pay. In my opinion, this contention cannot be sustained. The contract in its entirety is made subject to the rules and regulations imposed by the United States government. The contract in its entirety is made subject to force majeure. It is not deliveries only, but the contract obligation itself, which is thus made to depend upon these conditions.

Furthermore, in contracts to deliver and to accept and pay for an article of commerce, the market value of which is fluctuating, time is of the essence. The failure or refusal of the vendor to deliver or tender the monthly quantities at the time agreed is a breach which would discharge the buyer from further obligation to accept and pay. The buyer of an article thus fluctuating in value cannot be held to an obligation to accept and pay at other times and under different conditions when its market value may have greatly changed.

If plaintiff's contention is sound, it was excused from any obligation to perform during the entire period the governmental regulations were in force, the duration of which neither party could foresee, yet during the same period the defendant would remain obliged to accept and pay, if, after the end of the war and the lifting of the restrictions, the plaintiff might get in position to make deliveries. During that period the contract obligations would remain dormant. They would be revived when the restrictions were removed and the ability of the plaintiff to make deliveries is restored. No doubt the parties might have so phrased their contract as to be susceptible of this interpretation, but, in the absence of apt language to express that intention, the law will not infer it.

The applicable law seems to be well settled. If performance is made impossible by a subsequent valid act of law or governmental authority, both parties are discharged. If a contract is made subject in its entirety to a condition, and that condition happens, the rule is that both parties are discharged, and not that performance is suspended until the condition is overcome. This rule has frequently been applied when a contract is made subject to fires or strikes or other forms of force majeure. For authority, see the following: 3 Page on Contracts, § 1373; New England Concrete Const. Co. v. Shepard & Morse Lumber Co., 220 Mass. 207, 107 N. E. 917; Hull Coal & Coke Co. v. Empire Coal & Coke Co. (4 C. C. A.) 113 Fed. 256, 51 C. C. A. 213; Brooke Tool Mfg. Co. v. Hydraulic Gears Co. (English Court of King's Bench, Oct. 29, 1919) 89 L. J. K. B. N. S. 263; 9 A. L. R. 1507, and extended note; Roessler v. Standard Silk Dyeing Co. (2 C. C. A.) 254 Fed. 777, 166 C. C. A. 223; The Claveresk (2 C. C. A.) 264 Fed. 276, 281; Allanwilde Corp'n v. Vacuum Oil Co., 248 U. S. 377, 39 Sup. Ct. 147, 63 L. Ed. 312, 3 A. L. R. 15.

These rules are applicable to the present case. If they were not applicable, and if plaintiff had not stipulated for nonliability, it would have been liable under its first contract for failure to deliver the equal monthly installments; that is, 5 tons during July, August, and the ensuing months. If applicable to excuse plaintiff under the first contract, they are equally applicable to excuse defendant under the second contract, by the terms of which defendant agrees to furnish the manufacturer's import licenses, and without which plaintiff could not exercise its option to import from the Far East the rubber necessary to fill it. Neither party was in a position to perform owing to the regulations imposed by the United States government through its War Industries Board.

This was a condition which both parties, at the time of making these contracts, foresaw or anticipated might happen, and it was to meet that contingency that the contracts were made subject to all the rules and regulations thus to be imposed and to force majeure. Neither party could have had in mind merely a suspension or postponement of delivery during the war or while governmental regulations were in force, because no one could then foresee how long the war would continue, nor anticipate market or manufacturing conditions at the

end of the war and after the restrictions were lifted. It would require clear and apt language before a court would be justified in finding such to be the intent of the contracting parties. No such apt language is found in either contract, but, on the contrary, the language used by the parties clearly evidences a different intention, namely, that neither party was to be longer bound, if governmental regulations or force majeure interfered to prevent performance.

My finding upon the issues joined is in favor of defendant. Judgment will be rendered after five days.