**DELTA MINING CORPORATION, Plaintiff–Appellant,**

v.

**BIG RIVERS ELECTRIC CORPORATION, Defendant–Appellee.**

No. 93–2070.

United States Court of Appeals, Seventh Circuit.

Argued Oct. 28, 1993.

Decided March 17, 1994.

Eric A. Frey, Mark D. Hassler (argued), Frey, Hunt, Hassler & Lorenz, Terre Haute, IN, for plaintiff-appellant.

Patrick A. Shoulders, Ziemer, Stayman, Weitzel & Shoulders, Evansville, IN, Ralph W. Wible (argued), Holbrook, Wible, Sullivan & Mountjoy, Owensboro, KY, for defendant-appellee.

Before COFFEY and MANION, Circuit Judges, and SKINNER, District Judge.*

* The Honorable Walter Jay Skinner, District Judge for the District of Massachusetts, is sitting by

**1400**

COFFEY, Circuit Judge.

In January 1977, Big Rivers Electric Corporation ("Big Rivers"), a Kentucky electric-power generating cooperative, entered into a 10–year coal-supply contract with a local coal-mining corporation [1] which later merged with the plaintiff, Delta Mining Corporation ("Delta"), an Indiana coal-mining corporation. After the term of the contract had expired, Delta brought this suit alleging a breach of contract and seeking more than $18 million in damages from Big Rivers for its refusal to accept delivery of or pay for roughly ½ million tons of coal that Delta claimed remained to be shipped under the contract. After a bench trial, the district court entered judgment in favor of Big Rivers. We affirm.

## BACKGROUND

Delta argues that the contract obligated Big Rivers to accept a total of 3,138,000 tons of bituminous coal, although this amount is not specified in the contract. The plaintiff arrived at this figure by adding the tonnage figures listed in the table of scheduled monthly coal deliveries in Section 4 of the contract. The plaintiff established that its total deliveries to Big Rivers during the contract term were 669,957 tons short of the 3,138,000 tons of coal it contends it was entitled to ship. Delta identified three causes of these "undershipments": (1) Big Rivers reduced its monthly coal requirements by ten percent from 1981 through 1986; (2) both parties invoked the contract's force majeure clause [2] to suspend certain monthly shipments; and, (3) Delta, especially during the early years of the contract, failed to ship the full amounts of coal it was scheduled to ship each month under the contract.[3]

Because the plaintiff believed the contract was ambiguous, it introduced evidence extrinsic to the contract in an effort to demonstrate that the agreement should be interpreted as requiring Big Rivers to accept Delta's offer to "make up" all three categories of undershipments. The trial court determined that the contract was clear and unambiguous and refused to consider Delta's extrinsic evidence and entered judgment in favor of the defendant Big Rivers.

## ISSUES

Delta contends that the district court erred in refusing to find that the contract is ambiguous whether Delta had the right to "make up" (and be compensated for) the three categories of coal that it failed to deliver during the term of the contract: (1) the ten percent undershipments, (2) the force majeure undershipments, and (3) the contractually unexcused undershipments ("deficiency undershipments").

## DISCUSSION

■ The parties agreed to be bound by Kentucky law through application of the contract's choice-of-law provision. Under Kentucky law, "an ambiguous contract is one capable of more than one different, reasonable interpretation." *Central Bank & Trust Co. v. Kincaid*, 617 S.W.2d 32, 33 (Ky.1981). Before concluding that a contractual provision is ambiguous we must read it in light of the complete instrument. *See City of Louisa v. Newland*, 705 S.W.2d 916 (Ky.1986); *International Union of Operating Engineers v. J.A. Jones Const. Co.*, 240 S.W.2d 49 (Ky. 1951) (clause which appears ambiguous cannot be construed in isolation). Only if the trial court finds that the contract is ambigu-

designation.

**1.** This Kentucky coal-mining corporation, Fisher Holding Company, Inc. ("Fisher") merged with Delta after the term of the contract had expired. We will refer to both Fisher and Delta (Fisher's successor-in-interest to this contract) as "Delta."

**2.** This clause provides that if because of "any cause beyond the control and without fault or negligence of the party affected" the seller is unable to ship coal or the buyer is unable to receive or use it, then upon "prompt" written notice to the other party the obligations of the

parties "shall be suspended" for so long as the problem (flood, strike, fire, explosion, or act of God ...) persists.

**3.** The plaintiff Delta offers this court no explanation for its failure to fulfill its contractual obligations, but simply concedes that, "During the first several years of the Agreement, Fisher/Delta confronted difficulties in meeting both the quantity and quality requirements of the Agreement. These difficulties resulted in a deficiency undershipment totaling 269,923 tons of coal."

ous may the court receive extrinsic evidence "in an effort to determine the intention of the parties." *Kincaid*, 617 S.W.2d at 33.

### A. The Ten Percent Monthly Adjustments

■ The parties agree that the following language from Section 4 of the contract gave Big Rivers the option, upon proper notice, of increasing or decreasing the amount of coal it would accept each month by ten percent from the monthly quantities stated in Section 4:

> "4. Quantity. The quantities to be supplied by Seller and purchased by Buyer hereunder shall be as listed on the following table, *subject to the adjustments provided in this Section.* . . . [table of scheduled monthly tonnage omitted]
>
> Buyer shall give Seller at least 60 days advance notice in writing of quantity requirements for each month, provided that in the absence of such notice Seller shall be required to deliver the monthly tonnage specified above. At time of such notification, *Buyer may demand, and Seller shall furnish,* as much as one hundred ten percent (110%) or *as little as ninety percent (90%) of the monthly requirements listed above and such adjusted tonnage amounts will become binding* upon the Seller and the Buyer. . . .
>
> Monthly requirements, as adjusted in accordance with the terms of the preceding two paragraphs shall be termed *Adjusted Monthly Requirements.*
>
> Seller shall distribute the shipment of each month's quantity approximately evenly throughout the month." (Emphasis added.)

The plaintiff contends, however, that the above-quoted language does not clearly resolve the question of whether Delta has a right to "make up" any difference that might arise between the annual totals of scheduled monthly tonnage as listed in the contract and the amount of coal actually delivered pursuant to Big Rivers' Adjusted Monthly Requirements. Delta in an effort to establish that the contract was ambiguous called a number of witnesses. One testified that although he had administered hundreds of coal-supply contracts, he found the above-

quoted language in Section 4 "unusual" and "confusing." Another testified that, based on his experience administering coal-supply contracts for other utilities, he was of the opinion that other utilities frequently enter into contracts in which their ability to make monthly adjustments does not alter their duty to purchase some fixed amount of coal over the term of the contract.

We begin our analysis by noting that the plain language of Section 4 quoted above explains that the contract's scheduled monthly tonnage figures merely describe the quantity of coal "to be supplied by Seller and purchased by Buyer . . . *subject to* the adjustments provided in this Section." Among the "adjustments provided" is an option granted to the Buyer to reduce its scheduled monthly coal "requirements" by ten percent: "Buyer may demand, and Seller shall furnish . . . as little as ninety percent (90%) of the monthly requirements listed [in an accompanying table] and *such adjusted tonnage amounts will become binding* upon the Seller and the Buyer." (Emphasis added.)

We are at a loss to understand how Delta can argue that this language is unclear. To accept Delta's contention that Section 4 is ambiguous would require us to hold that it is "capable of more than one different, reasonable interpretation." *Kincaid,* 617 S.W.2d at 33. The only alternative interpretation the plaintiff has offered, however, is that the parties may have intended Big Rivers to commit to purchasing precisely 3,138,000 tons of coal over ten years (the sum of the annual totals of scheduled monthly tonnages) despite having failed to set forth this (or any other) total delivery figure in their detailed contract.

Far from being reasonable, such an interpretation would fly in the face of logic because it is clear that the contract's annual tonnage totals are merely the sum of the twelve scheduled monthly tonnages that Big Rivers would be required to purchase each year "in the *absence* of" Big Rivers providing "60 days advance notice in writing" that it was adjusting some or all of these monthly requirements. There is no doubt that if Big Rivers had *failed* to give proper notice that it

was reducing its monthly requirements, it would have been obligated to purchase all of the scheduled monthly amounts of coal, which when added together would amount to the total figure (3,138,000 tons) that Delta contends it is entitled to ship. The parties do not dispute that (1) beginning in 1981, Big Rivers *did* adjust its requirements downward by ten percent (after providing the plaintiff with proper notice), *and* (2) that the contract provides that "such adjusted tonnage amounts will become binding."

Because Section 4 plainly states that Big Rivers' adjusted tonnage figures are binding on the parties, we agree with the trial court that this section of the contract is unambiguous, and hold that the court properly refused to rely upon the contrary testimony of plaintiff's witnesses. "Absent any need to clarify or define terms of art, science or trade, expert opinion testimony to interpret contract language is inadmissible." *TCP Industries, Inc. v. Uniroyal, Inc.*, 661 F.2d 542, 549–50 (6th Cir.1981). *See also Kincaid,* 617 S.W.2d at 33 ("extrinsic evidence may not be resorted to" unless terms are ambiguous).

### B.  The Force Majeure Shortages

Section 15 of the contract provides that if because of "any cause beyond the control and without fault or negligence of the party affected" the seller is unable to ship coal or the buyer is unable to receive or use it, then upon "prompt" written notice to the other party to the contract the obligations of the parties "shall be suspended" for the duration of the time in which the critical problem interferes with the fulfillment of the contractual obligation. "Makeup of deficiencies in deliveries of coal caused by force majeure," Section 15 goes on to state, "shall be as may be mutually agreed upon by Buyer and Seller."

The district court interpreted the contract language providing for the possible makeup of suspended deliveries to mean that the affected coal would be permanently suspended from the agreement *unless* the parties mutually agreed that the deficiencies caused by the emergency would be made up at a later date. Delta argues that Section 15 is ambiguous because it would be equally reasonable to find that "the force majeure clause would only operate to *'defer'* Big Rivers' obligation to purchase its monthly quantity of coal." Delta contends that the word "suspended" may reasonably be read as meaning "postponed," so that the phrase "the obligations of the parties shall be *suspended*" does not, as the district court found, unambiguously mean that the parties' obligations shall be "permanently suspended." Moreover, the plaintiff contends, that it is unclear what the parties intended when stating that "[m]akeup of deficiencies in deliveries of coal caused by force majeure *shall be as may be mutually agreed upon by Buyer and Seller.*" Delta contends that because of the mandatory term "shall," the underlined phrase could reasonably be read as *requiring* the parties to "negotiate in good faith to arrive at a reasonable time and provision" for makeup of coal deliveries that had been "postponed" until after the critical period had ended. Delta concludes that because the above terms are ambiguous, the trial court should have considered the extrinsic evidence introduced at trial to explain their meaning.[4]

Initially we note our agreement with the plaintiffs' observation that the word "suspended" is frequently used in the sense of "postponed." See *Random House Webster's Dictionary* 1346 (1991); *Black's Law Dictionary* 1615 (6th ed. 1990). Secondly, we agree that, when read in isolation, the provision stating "Makeup of deficiencies in deliveries of coal caused by force majeure *shall be as may be* mutually agreed upon" is less than a model of clarity because when used in a contract, the word "shall" is generally "imperative or mandatory" (*Black's Law Dictionary* 1375), while "may" is generally used to

---

4.  To illustrate the effect Delta's interpretation would have on the parties, the district court provided the following example gleaned from the evidence presented at trial. Fifteen years ago, in February 1979, Big Rivers ordered 20,000 tons of coal per the Monthly Requirements provided in Section four, but Delta shipped only 5,489 tons. 11,000 tons of the shortfall can be traced to force majeure, while 3,511 tons represent an "unexcused undershipment." Delta would contend that Big Rivers remains obligated to purchase the 11,000 tons the plaintiff failed to ship in February 1979 due to force majeure.

imply optional conduct (*id.* at 979). Thus the less than artfully drafted clause "shall be as may be" appears to mix both mandatory and discretionary directives.

■ When interpreting a contract, however, we are bound to read all provisions in light of the complete instrument, *City of Louisa*, 705 S.W.2d at 919, and clauses that may appear ambiguous when viewed in isolation must be interpreted in light of the parties' intent and the language contained in the entire contract. *See International Union of Operating Engineers*, 240 S.W.2d at 54.

■ The plaintiff's contention that the phrase "shall be *as may be* mutually agreed upon" *requires* the parties to "mutually agree" treats the words "as may be" as surplusage, in contravention of the rule of construction directing us to give "effect to all parts and every word in [the contract] if possible." *City of Louisa*, 705 S.W.2d at 919. The district court reasoned in its Post–Trial Findings of Fact and Conclusions of Law:

> "Delta premises its argument on Section fifteen's use of the imperative term 'shall.' This is nonsensical. When read in the context of the paragraph, the 'shall' term is not a controlling imperative; rather, it is subordinate to the permissive phrase '*may* be as mutually agreed upon.' The parties 'may' mutually agree to make up the force majeure deficiencies, or they 'may' not mutually agree to make up such deficiencies. . . . Section fifteen plainly conveys that the parties intended that tonnage affected by force majeure be permanently suspended from the Agreement, *unless* the parties mutually agree that the deficiencies should be made up at a later date. If either party fails to agree to make up force majeure tonnage, then that tonnage shall not be made up. Either party had a unilateral right to prohibit make-up of force majeure tonnage."

We agree with the trial court's interpretation of the clause "shall be as may be mutually agreed upon" because it gives effect to each word in the instrument and considers the contract language in its entirety.

■ Likewise, although the term "suspended" is frequently interpreted as being synonymous with "postponed," in construing the meaning of a contractual term we must be mindful of the context in which the word is used and the parties' intent as set forth in the entire contract. The Fourth Circuit was called upon to interpret the terms of a "strike clause" in a similar supply contract in *Hull Coal & Coke Co. v. Empire Coal & Coke Co.*, 113 F. 256 (4th Cir.1902). In that case, the defendant promised to sell 20,000 tons of coke to the plaintiff during the term of the contract (January 21, 1899–December 31, 1899), subject to a clause providing that deliveries "may be suspended" in the event of "strikes, accidents, deficient transportation, or other cause, unavoidably causing stoppage or partial stoppage of the works." *Hull Coal*, 113 F. at 258. The supplier did endure a strike, deficient transportation, and a drought (all of unspecified lengths) that prevented it from processing or shipping the full 20,000 tons of coke during the contract term. After the term of the contract, the buyer sued, demanding that the defendant make up the deliveries suspended pursuant to the strike clause. As the court explained:

> "Plaintiff contended the word 'suspended,' in the strike clause, should be construed 'postponed,' and shipments not made within the time [of the contract] should be made after . . . in short, that the guaranty of 20,000 net tons was absolute . . . ."

*Id.* at 259.

The Fourth Circuit rejected this interpretation and held that the defendant was *not* required to make up deliveries after the term of the contract. The court explained that time was of the essence in such supply contracts, and that:

> "[w]here the intention of the parties to limit a contract to a certain period is manifest, it is of the essence of the contract. . . . The subject-matter of the contract, its purpose, and the situation of the parties, are material to determine their intention and the meaning of the words used. When these are ascertained, they must prevail over the dry words used."

*Id.* at 260 (citations omitted and emphasis added).

Likewise in the case before us we must keep in mind that the contract we are interpreting was drafted by the defendant utility to assure itself a steady supply of fuel with which to produce electricity during a specified ten-year period. This context is important because a utility requires delivery of a given amount of fuel each and every month. Evidence in the record before us discloses, for example, that the plaintiff's undershipments at times left the defendant with no option but to purchase the undersupply of coal on the "spot market" at higher prices. Yet the plaintiff would have us hold that the defendant drafted the force majeure clause so as to bind itself to accept late "makeup" deliveries at any time, including any period of time after the expiration of the contract when the plaintiff was able to supply the coal (presumably when the defendant's coal demand was not as high as it was during the critical period).

Finally, we point out that the parties have demonstrated elsewhere in the contract that they knew how to draft a *clear* contractual right to require "makeup" deliveries. Section 3 of the contract plainly states, for example, that:

"In the event that Seller has not met the quantity requirements of Section 4 by December 31, 1986, *Buyer may at its option extend the term of this agreement for that period of time required to deliver the remaining quantities of coal* at the monthly tonnage rates required by Section 4."

We have no doubt that if the parties had intended to provide Delta with a similar contractual right to "make up" its undershipments in Section 15, they would have so provided with equal clarity and would not have relied upon creative judicial interpretations to give effect to that intent.

Although we are convinced that the disputed terms are not ambiguous when construed in light of the entire contract, we note that the plaintiff's extrinsic evidence in any event fails to support its argument. For example, Delta introduced correspondence from Big Rivers for the purpose of demonstrating that the defendant "understood" that it was required to accept makeup deliveries after the term of the contract. But the concluding paragraph of the letter Delta submitted (sent by Joe Craig, Big Rivers' Fuels Manager, and dated February 28, 1977) expressly provided that Big Rivers had the right to *request* but *not* demand makeup of force majeure shortages:

"Big Rivers *requests* that the shortage of tonnage supplied under our contract from January 1 to the present be made up by Fisher Holding Company, preferably by August 31, 1977. *If you are in agreement* with makeup of tonnage on this basis, please confirm." (Emphasis added.)

Thus we agree with the district court that Section 15 did not provide Delta with the right to *require* Big Rivers to accept makeup deliveries of coal after the term of the contract.

### C. The Deficiency Undershipments

■ Lastly, Delta also claims the right to make up the coal shipments that it failed to deliver without any contractual excuse during the term of the contract. The plaintiff boldly asserts that the very fact that Section 3 of the contract specifically provides *only Big Rivers* with the option of extending the contract to allow for the makeup of such undershipments creates an "ambiguity" as to whether Delta should be accorded the same option. Continuing to present what the district court accurately described as a "myriad of theories" based upon extrinsic evidence, Delta contends that, under Kentucky law, contracts that provide one party but not the other with an option should be construed as providing both parties with the same option under the "doctrine of mutuality." *City of Louisa*, 705 S.W.2d at 919. What *City of Louisa* actually held, however, was that: "The legal interpretation of a contract should be made in such a way as to make the promises mutually binding on all parties *unless such a construction is wholly negated by the language used.*" *Id.* (emphasis added).

We agree with the trial court and hold that the language in the contract "negate[s]" any construction thereof that would obligate Big Rivers to accept now the coal Delta failed to deliver during the term of the contract. In the instant case, well experienced counsel dealing at arm's length in the best interest of their respective clients agreed to a contract

devoting an entire section providing *Big Rivers* with the right to exercise the option of requiring makeup deliveries, but failed or refused to allow Delta the right to exercise a similar option dealing with past contract undershipments. In our opinion the language in Section 3 could not be more clear:

"In the event that the Seller has not met the quantity requirements of Section 4 by December 31, 1986, *Buyer may at its option* extend the term of this Agreement for that period of time required to deliver the remaining quantities of coal at the monthly tonnage rates required by Section 4. *Buyer may, however, decline to exercise this option* and seek any other available remedies" (emphasis added).

 Because the above language is clear and unambiguous, the trial court did not err in refusing to rely upon the extrinsic evidence Delta introduced to explain its meaning. *Kincaid,* 617 S.W.2d at 33. We observe, however, that this proffered extrinsic evidence would have afforded the plaintiff no help even if it had been considered. Delta sought to demonstrate that on several occasions during the contract Big Rivers had pressed Delta to make up its unexcused undershipments. According to Delta, this "course of conduct" is evidence that Big Rivers understood that the contract *obligated* it to accept any makeup shipments Delta chose to deliver. In support of the same proposition, Delta also introduced evidence that Big Rivers had accepted makeup shipments from other coal suppliers.

A review of the record reveals that Big Rivers demanded makeup deliveries from many if not *all* of its suppliers who were in default during the time period at issue (the late 1970s), and while some of these suppliers made up their contractually unexcused undershipments, Delta failed to fulfill its contractual obligations. We agree with the trial court's statement in its Post–Trial Findings of Fact and Conclusions of Law that these

demands by Big Rivers for makeup shipments during the term of the contract were in the nature of saying "fix the problem," and offer no support for the proposition that Delta has a contractual right to require Big Rivers to accept late coal shipments *after the term of the contract* when it no longer needed the coal.

We hold, therefore, that Section 3 of the contract means what it unambiguously says: Big Rivers, and Big Rivers only, had the option of requiring makeup of Delta's unexcused undershipments.[5] This is merely a particular application of the rule of *expressio unius est exclusio alterius. See Parrish v. Newbury,* 279 S.W.2d 229, 233 (Ky.1955); *Plumbers and Steamfitters Local 150 v. Vertex Const. Co.,* 932 F.2d 1443, 1449 (11th Cir.1991) ("the doctrine of *expressio unius est exclusio alterius* instructs that when certain matters are mentioned in a contract, other similar matters not mentioned were intended to be excluded").

### CONCLUSION

The judgment of the district court is AFFIRMED.

---

5. In this regard we note our agreement with the district court's observation that, "Whether the Agreement is 'harsh' or not is irrelevant to the questions of law raised by its application. That a contract may be harsh does not detract from its clarity; indeed, the supposed harshness of this

Agreement shines through precisely because of the clarity of its language."