## BLACK & YATES, Inc., v. NEGROS-PHILIPPINE LUMBER COMPANY*

(No. 1236; December 23, 1924; 231 Pac. 398)

CONTRACTS—BURDEN OF PROOF—EXISTING LAW PART OF CONTRACT—REASONABLE TIME FOR PERFORMANCE—SALES—EFFECT OF CASUALTY CLAUSE—EXCUSE FOR NON-PERFORMANCE—IMPOSSIBILITY OF PERFORMANCE.

1. Contract impossible of performance when made may be made to be performed after obstacles are removed.
2. Plaintiff has burden of proof of contract sued on.
3. Parties are presumed to have entered into contract in light of existing principles of law which become part thereof.
4. Where no time of performance is specified, law implies performance must be within reasonable time, notwithstanding use of language "as soon as practicable," or similar language.
5. What is a reasonable time for performance of contract depends on circumstances of each case.
6. Impossibility of performance of contract for sale of lumber for three years is such unreasonable time as to excuse performance unless contract specifically provides otherwise.
7. Intent that unreasonable delay through impossibility of performance should not excuse performance should clearly appear.
8. Unless otherwise provided, casualty clause, operating to relieve promisor from liability for failure to make deliveries in accordance with contract, obviates also obligation

to make them thereafter, except possibly where only delay of short duration is caused.

9. Contract for lumber made up of correspondence which referred to present demoralized condition of transportation facilities, in which seller expressed expectancy of relief before particular time and agreed to make delivery "as soon thereafter as possible," *held* of same effect as though containing an expressed casualty clause excusing performance if transportation could not be obtained.

10. Courts do not favor construction of casualty clause which gives temporary excuse only for nonperformance.

11. Evidence *held* insufficient to establish contract for sale of lumber to be delivered when transportation facilities become available, regardless of how remote such time might be.

12. Contract for sale of lumber made up of correspondence which referred to unsettled transportation conditions, and expressed belief conditions would improve by particular time, and provided for delivery as soon as possible thereafter, *held* to contemplate delivery within reasonable time, such that it was discharged by lapse of unreasonable time (three years) before transportation faciliites became available.

13. Where party to contract declines to accept renunciation and sue for damages, but insists on performance, contract remains in force, and any occurrence which discharges it may be taken advantage of by other party.

14. Where plaintiff, suing on contract for purchase of lumber, admitted that defendant was not in default until he failed to make delivery after transportation facilities became available in 1919, which was such unreasonable time after execution of contract in 1916 that defendant was no longer required to perform, plaintiff could not recover on theory that defendant, by sale to another in 1916, had rendered himself unable to perform before expiration of reasonable time within which performance could have been demanded had facilities become available.

*NOTES—See Headnotes (1) 13 C. J. p. 583 (1926 Anno.); (2) 13 C. J. pp. 756, 757; (3) 13 C. J. p. 560; (4) 13 C. J. p. 683; (5) 13 C. J. p. 685; (6) 35 Cyc. p. 244; (7) 13 C. J. p. 639 (1926 Anno) (8) 35 Cyc. p. 248; (9) 35 Cyc. p. 247; (10) 35 Cyc. p. 248; (11) 35 Cyc. p. 187; (12) 35 Cyc. p. 247; (13) 13 C. J. p. 655; (14) 35 Cyc. p. 625.

APPEAL from District Court, Laramie County; WILLIAM A. RINER, Judge.

. Action by Black & Yates, Inc., against the Negros-Philippine Lumber Co. for breach of contract in failing to deliver certain mahogany lumber. From a judgment for defendant, plaintiff appeals.

*Haggard & O'Mahoney* and *M. A. Kline* for appellant.

The power of the Court to consider the circumstances under which the contract negotiated is well established; J. W. Denio Milling Co. v. Malin, 25 (Wyo.) 143; Burrows v. Co. (Calif.) 184 Pac. 5; Keen v. Ross (Ky.) 216 S. W. 605; Prowant v. Sealy (Okla.) 187 Pac. 235, 2 Page Conts. 1123; the intention of the parties as disclosed from their writings should be considered; Berg v. Erickson, 234 Fed. 817; Nitke v. Co., 263 Fed. 888; war conditions rendered time of performance indefinite. There was an offer and acceptance by telegram; 1 Page Conts. 296; Perry v. Co., 15 (R. I.) 380; Weld v. Co., 205, Fed. 770; a subsequent letter imposing conditions could not affect general acceptance by telegram; Beach v. Co., 202 (Mass.) 177, 88 N. E. 294; Metro. Co. v. Co., 196 (Mass.) 72, 81 N. E. 645; Gartner v. Hood (Ga.) 12 S. E. 878; Williams v. Burdick Co. (Ore.) 125 Pac. 844; a printed letter-head is no part of a contract written underneath; Summers v. Hubbard, 153 (Ill.) 102; Sturtevant Co. v. Films Co., 216 N. Y. 199; defendant was bound, but acts as its sales manager; Hammitt v. Co. (Id.) 181 Pac. 336; Langstroth v. Co., 148 N. Y. 224; Moagget v. Co. (N. J.) 111 Atl. 656; Harvey v. Bourn, 112 (Ark.) 63; Jenkins v. Co., 147 Fed. 641; there was no discharge by impossibility of performance, 5 Page Conts. 2675; Standard Co. v. Co., 244 Fed. 250; N. P. R. Co. v. Co., 195 U. S. 439; defendant contracted its output to another and thus breached its contract. The delay was not greater than contemplated by the parties; Baylies v. Fetterpleie, 7 (Mass.) 324; Hull Co. v. Coal Co., 113 Fed. 256; reasonable time depends upon circumstances surrounding the making of the contract, 9 Cyc.

613; in re Hellams, 223 Fed. 460; Concrete v. Boyes, 180 Mich. 609; burden is upon defendant to establish that a delay of three years was beyond the contemplation of the parties. The correspondence shows that the delay which occurred was within the contemplation of the parties; Laughlin v. Co., (Tex.) 218 S. W. 144; Pottash v. Co., 272 Fed. 658; Meng Co. v. Co., 58 (Wash.) 223, 28 L. R. A. (N. S.) 1007.

*Rogers, Johnson & Fuller* and *Pierpont Fuller* and *Clyde M. Watts* for respondent.

The offer at most was to sell and deliver within a reasonable time, if transportation could be obtained within such time. Neither party was bound to deliver or accept after a reasonable time had elapsed; the agreement was contingent upon strikes, delays of carriers and unavoidable conditions beyond control. Defendant's agent could not contract otherwise. Storey on Agency, 832 Corpus Juris 578; a contract silent as to time implies performance within a reasonable time, 25 Cyc. 179; Mechem on Sales I. 1134; if performance is impossible within a reasonable time the contract ends; Cameron & Co. v. Mathews, 124 S. W. 192; Eppens v. Littlejohn, 164 N. Y. 187; Williston on Conts. 1968; Whiting v. Gray, 27 (Fla.) 482; Metro Co. v. Billings, 202 (Mass.) 457; the offer of February 1916 was withdrawn before acceptance; Frank v. Stratford-Hancock, 13 (Wyo.) 37; Waterman v. Banks, 144 U. S. 394; Stitt v. Huidekopers, 17 Wall 384; modification of an offer before acceptance amounts to a withdrawal; Stroock Co. v. Co., 213 (Mass.) 354; I Page on Conts. 132; Craig v. Harper, 57 (Mass.) 158; Hopkins v. Co., 137 (Wis.) 583; a qualified conditional acceptance is in effect a rejection of the offer, Minn Co. v. Mill, 119 U. S. 149, 13 C. J. 281; Egger v. Nesbit (Mo.) 27 S. W. 385; Campania v. Co., 146 U. S. 483; Lewis v. Johnson, 123 (Minn.) 409; the telegram of March 20th, 1916 was not an acceptance; Hite v. Co., 164 Fed. 944; Wheeling Co. v. Evans (Md.) 55 Atl. 373; the order of

March 1916 must be considered with the telegram; Williston on Conts. 628, 13 C. J. 528; Gibbs v. Wallace, 58 (Colo.) 364; Lynchburg Mill v. Co. (Va.) 57 S. E. 606; Cement Co. v. Warehouse Co., (Calif.) 199, Pac. 369; Scaife Co. v. Co., (Wash.) 89 Pac. 882; Beach Co. v. Mfg. Co., 88 N. E. 924; the correspondence shows no acceptance and no agreement; Shaw Co. v. Hackbarth Co. (Ore.) 201 Pac. 1066; inability to obtain transportation within a reasonable time terminated the contract, if there was one, without liability to either party; Allanwilde Co. v. Oil Co., 248 U. S. 377; The Claveresk, 264 Fed. 276; Metro Bd. v. Dick Ann Cas. 1918, C. 390; Roessler Co. v. Dyeing Co., 254 Fed. 777; Davis v. Mining Co. (Mass.) 49 N. E. 629; New Eng. Co. v. Lumber Co., 220 (Mass.) 207; appellant's authorities cited upon impossibility of performance are not in point; the delay was of greater duration than contemplated by the parties and terminated the contract; Allanwilde Co. v. Oil Co., supra; where performance becomes impossible because of an outbreak of war involving a nation of which one of the parties is a citizen or subject, the contract is frustrated and dissolved; Roessler Co. v. Dyeing Co., supra; Williston on Conts. Vol. 3, Sec. 1938; the entering of the U. S. into the war had that effect; Badische Co., 15 A. L. R. 1517; the Kirchmann-purchase was in effect an abrogation of the contract by a mutual consent.

BLUME, Justice.

This is an action brought by Black & Yates, a Corporation, plaintiff, against the Negros-Philippine Lumber Company, a Wyoming corporation, defendant, for the recovery of $199,625. The plaintiff in its petition alleged that by a written offer made by defendant to plaintiff on February 14, 1916, and a written acceptance thereof made by plaintiff thereafter, defendant and plaintiff entered into a contract for the purchase by plaintiff of one million board feet of Philippine mahogany lumber at $50 per one thousand board feet, for 975000 board feet thereof and at $75 per thousand

board feet for 25000 board feet thereof, and agreed to deliver the same to plaintiff f. o. b. New York City ''as soon thereafter as it should become possible to secure transportation therefor by vessel from the Philippine Islands to New York City;'' that delivery of the said lumber in the manner aforesaid became possible on or about January 1, 1919, and has been possible at all times thereafter, and that said defendant has failed and refused, and still fails and refuses to make said delivery. Defendant denied the making of said contract, and alleged that, if made, it was for delivery within a reasonable time from the date of the negotiations and that the impossibility of securing shipping, due to war conditions which prevented delivery for three years, abrogated the contract. The case was tried to the court without the intervention of a jury and judgment was entered in favor of the defendant.

Defendant was the owner of certain mahogany timber in the Philippine Islands, and of a sawmill there located. Plaintiff was a wholesale dealer in hardwood lumber, with its principal place of business in New York City. During the year 1915 plaintiff had purchased from defendant through Lew L. Thomas, defendant's sales' manager, 350,000 feet of this mahogany and had been active in introducing it on the eastern market in competition with African mahogany. Except for the 350,000 feet above referred to, defendant had never sold any of its product in the eastern portion of the United States and desired to create a market for it there. Its sales' manager, in February, 1916, suggested that plaintiff purchase an entire shipload, consisting of one million feet, and submit a formal request for prices and terms, so that in reply a formal offer might be made. In response to this request plaintiff wrote the first letter on February 14, requesting prices and terms for 500,000 to 1,000,000 feet of lumber. At that time, the European war had been raging for some time, and shipping conditions were in a demoralized condition owing to said war. In response to the request for prices and terms as afore-

said, the defendant, through its said sales' manager, on February 14, 1916, quoted prices and terms for said lumber, viz: one million board feet at $50 per M; 500,000 board feet at $50 per M, plus any additional freight charge over and above $20.50, and $75 .per M for flitches. The only reference therein to the time of delivery is in paragraph 11 of the letter, which is as follows:

"With reference to the time of delivery, we could not say exactly just when we could deliver either the one million board feet or the five hundred thousand board feet shipment owing to the present demoralized condition of transportation on the water. However, we confidently expect to be able to procure transportation facilities loading at the mill in April or May of this year, and would make the delivery to New York City as soon thereafter as possible."

Two letters were written on February 15, 1916, but need not be set forth. All these letters were written at New York. On February 24, 1916, after Thomas had gone to Chicago, he received a communication that approximately one million feet of lumber might be shipped from the Philippine Islands to the Pacific coast, and advised plaintiff of that fact. The latter, on March 2, 1916, asked whether or not defendant would forward this lumber from the Pacific coast to New York at the price of $50 per thousand feet quoted in the letter of February 14. On March 6, 1916, Thomas replied that he would not be able to send the entire million feet, owing to the extra freight that would have to be paid, and also stated:

"Not a thing, or even a sign has turned up for the transportation of the million feet, and it is my candid judgment that there is not one chance in a million of getting transportation for it at any rate direct from the mill to New York City."

On March 20, plaintiff wired and wrote an acceptance of the offer made on February 14, 1916, as to the million feet of lumber, stating in its letter, among other things, the following:

"We have decided to take the one million feet Philippine mahogany for shipment in April or May, or as soon thereafter as you can secure transportation."

This communication was answered by Thomas on March 24, 1916, in which he apparently recognized that a proper acceptance of the contract had been made, and stated among other things that transportation had not yet cleared, but that he was hoping that he would be able to secure it as soon as he could reach the coast. Various letters were interchanged between the parties up to June 3, 1916, showing that the plaintiff urged said Thomas to secure transportation, and that the latter was making every endeavor in that direction. Among other things, Thomas attempted to have the plaintiff buy a ship of its own to transport the lumber across the ocean. This the plaintiff, however, refused to do, but asked the defendant to do so instead, offering to loan it money in order to enable it to do so. In the middle of May, 1916, Thomas had an offer to transport the lumber to San Francisco at $30.00 per M feet, and on May 15, and again on May 19, 1916, wrote plaintiff, advising that the latter should take five hundred thousand feet of lumber delivered on the Pacific coast. Plaintiff, on May 26, 1916, answered that they would take one million feet at San Francisco, but stated in addition thereto as follows:

"You understand, of course, Mr. Thomas, that in taking a million feet in California we are not taking it in place of the million feet on order to come to New York or as soon as we can get the transportation, but we are taking it to keep our trade connection intact."

To this Thomas answered on June 3, among other things, as follows:

"We note that you say, 'In taking a million feet in California we are not taking it in place of the million feet on order to come to New York.' To this we would say that if we are able to deliver a million feet to San Francisco, being lucky enough to get transportation, you would have to accept it in lieu of the million feet we were to let you have with delivery at New York, in the event we could get transportation to New York. It would be unreasonable to expect us to tie up indefinitely such a large amount of lumber, and let it hang fire that way, running on into the future that way indefinitely for a number of years, and particularly would that be true in these times when transportation is all shot to pieces. * * * Your company did not see its way clear to provide transportation in the manner suggested, and inasmuch as we cannot get the transportation to make the New York delivery, and inasmuch as your company does not see its way clear to handle the transportation in the way suggested, we must consider the New York delivery of a million feet a closed incident, as it certainly would be poor business to let a matter of that kind drag on indefinitely, or for some future delivery, no one knows when."

For some reason, not disclosed by the record, the proposition of having the lumber transported to San Francisco at $30.00 per M feet, as above mentioned, was abandoned, and Thomas entered into negotiations with one Kirchman, an owner of vessels, for the purchase of the lumber. A definite proposition to sell was made on May 31, 1916, and Kirchman accepted the offer on June 5, 1916. The foregoing statement presents a general outline of the facts necessary to be considered. Some additional facts will be mentioned later. We shall, for the purposes of this case, take it for granted that a contract of some sort was en-

tered into between the parties. The contract sued on in
this case, as will be noticed from the pleadings, and in-
sisted upon throughout, is, that the plaintiff was entitled
to delivery of the lumber in question after the impossibil-
ity of transportation had been removed, which, as the evi-
dence shows, was some time in the spring of 1919. And
the question, therefore, to be solved in this case is, as to
whether or not a contract bearing that interpretation was
entered into between the parties herein.

1. It is conceded, and the case was tried in the lower
court, upon the theory that the agreement contemplated a
direct shipment of the million feet of lumber from the Phil-
ippine Islands to New York by water; that it was impossible
to perform the contract until 1919 and that defendant was
excused from performance until that time. We do not feel
justified in departing from the theory so adopted and shall
accept it as the starting point. Hence, as stated by counsel
for plaintiff, the only real question before this court is to
determine whether the conditions obviously known to the
parties when they made the contract in March, 1916, and
which prevented performance until 1919, imposed merely
a delay which was in contemplation of the parties when they
made the contract; or, in other words, as heretofore stated,
whether the parties intended that delivery of the lumber
should be made after the impossibility to deliver was re-
moved. There is no doubt that the parties had the absolute
right to make a contract to be performed after the obstacles
to performance were removed. Whiting v. Gray, 27 Fla.
482, 8 So. 726, 11 L. R. A. 526. Such is the contract which
the plaintiff claims was made in this case. If that is true,
then, of course, no question of frustration of commercial
adventure before, or impossibility of performance merely
until, 1919 could arise. The burden of proof to establish
the contract sued on rests upon plaintiff. We know of no
reason why we should presume that it should be performed
in 1919, casting, as claimed by counsel for plaintiff, the bur-
den of proof upon defendant to establish that a delay of

three years was beyond the contemplation of the parties. Parties presumably enter into a contract in the light of existing principles of law. 13 C. J. 560-1. Thus it was said in Farley v. Perry Board of Education, 62 Okl. 181, 162 Pac. 797, that the existing law is presumed to be a part of every contract, notwithstanding express terms therein apparently to the contrary. Where no time for performance is specified in a contract the law implies that it must be performed within a reasonable time. 35 Cyc. 179; Whiting v. Gray, supra; Mechem on Sales, Vol. 2, Sec. 1134. This is substantially true even where the mode of defining the time of performance of a commercial contract is by the use of the phrase "as soon as practicable" or other similar phrases. 35 Cyc. 181; Williston on Sales, Sec. 452; Mechem on Sales, supra; William Cameron & Co. v. Mathews 59 Tex. Civ. App. 118, 124 S. W. 192; Whiting v. Gray, supra. It follows, of course, that in order to exclude the case at bar from the operation of this principle of law, the contract, construed in the light of the surrounding circumstances, must be shown to provide for a different time of performance.

As to what is a reasonable time depends, of course, upon the circumstances of each case, and the war conditions, the scarcity of ships and the general commercial confusion existing, known to and in contemplation of the parties, must be taken into consideration. Pottash v. Herman Beach Co., (C. C. A.) 272 Fed. 658; Laughlin v. Crespi Co. (Tex. App.) 218 S. W. 144. We have not, however, been pointed to any case where three years' delay has been considered reasonable. The longest time, so far as we have found, which any court has impliedly held to be reasonable is two years and two months. This was in Hadley v. Clarke, 8 T. R. 259, 101 Eng. Rep. 1377, where the court held that a commercial venture was not frustrated by reason of an impossibility of delivery during the period mentioned. This case, together with other earlier decisions, is condemned by Williston in his work on Contracts, Vol. 3, p. 3327, note 79,

where the author says that these cases "go to an extreme in holding the parties bound in spite of long prospective or actual delay." We could not well be asked to hold any time beyond such period to be a reasonable time. The parties could, of course, as heretofore stated, make a contract to be performed thereafter, no matter how distant the date of performance might be; but, in view of the fact that commercial transactions are generally entered into for the purpose of supplying present needs and not needs for an indefinite future, it would seem that, in a case like this, the intention of the parties that the contract might be performed even after the expiration of such reasonable time should appear reasonably clearly. This view is supported, we think, by cases which we shall now consider.

It is held that when deliveries according to contract have been prevented by the operation of a casualty clause contained therein such as that of fire, strike or other unavoidable contingency, the promisor is relieved altogether, not only from liability for failure to make such deliveries, but also from the obligation to make them thereafter, unless, probably, only a delay of short duration is caused thereby, or unless the contrary appears from the contract. Normandie Shirt Co. v. J. H. & C. K. Eagle, Inc., 238 N. Y. 218, 144 N. E. 507 and cases cited; Hull Coal & Coke Co. v. Empire Coal & Coke Co., 113 Fed. 256, 51 C. C. A. 213; Edward Maurer Co. v. Tubeless Tire Co., (D. C.) 272 Fed. 990, affirmed in (C. C. A.) 285 Fed. 713, and cases there cited. Williston on Contracts, Sec. 1968 and cases cited; Jackson v. Marine Ins. Co., 10 L. R. 125 (1874). And it is further held that if it be the intention of the parties that the operation of the casualty clause is merely to delay delivery, requiring such delivery to be made subsequent to the unavoidable casualty, or within a reasonable time thereafter, the contract must clearly so provide. Edward Maurer Co. v. Tubeless Tire Co., supra; Normandie Shirt Co. v. J. H. & C. K. Eagle Inc., supra. The reasons of these rules are illustrated in the case of Geipel v. Smith, 26 L. T.

(N. S.) 361, decided in 1872. There the defendants agreed to carry a cargo of coal to Hamburg "restraints of princes and rulers excepted." The coal was not deliverable to Hamburg on account of a blockade. Cockburn, C. J., in holding the contract ended, stated, among other things:

"But then Mr. Cohen says that the expression 'restraint of princes' applies to the whole contract, and that the contract must be read thus; that whereas the ship was to go to Hamburg when wind and weather permitted, subject to the restraint of princes, when that restraint, once existing, is removed, the vessel is to go when the wind and weather permits. If we are to construe the contract in that way, I think the consequence would be monstrous—to hold that if a blockade should last for an unusually long time, the defendants would be bound to keep their vessel idle all that time until the blockade should cease. It must be taken, if you are to construe the contract in that way, that the restraint of princes must have an end within a reasonable time. The defendants meet the plaintiffs' claim by saying, 'It was impossible in the present case that the contract should be performed within a reasonable time; granted that the restraint of princes must be for only a reasonable time, then I should be bound to start; but having lasted an unreasonable time, I am not so bound.' It may well be that if he failed to make out such a plea, he would have the answer for it; but as the case now stands, I think the defense a good one."

And in the same case Blackburn, J., said:

"If whilst the blockade existed there was a 'restraint of princes' which excused the performance of the contracts, the moment the blockade was raised were not the defendants bound to carry out their contract? If the blockade had existed only for an hour or two, or for a very short time, I do not think it would put an end to the contract; but I cannot agree with Mr. Cohen's contention that, however long the

blockade might have existed, even if it had lasted as long as the blockade of Toulon, some eight or nine years, I think, or as long as some of the blockades in the War of Independence between the United Provinces and Spain; that after that enormous time the owners of the ship and cargo should be obliged to have them ready in order that the contract might then be carried out. It seems to me monstrous and inconvenient to hold such a position, the consequences being to frustrate the very object of the contract, which is one for the prompt transport of the shipper's goods, and the remunerative employment of the shipowner's vessels. Such a state of affairs, in my opinion, not only produces a delay in the fulfillment of the contract, but puts an end to it altogether.''

In the case of Edward Maurer Co. v. Tubeless Tire Co., supra, the contract was made during war, subject to the rules and regulations of the United States Government, and in contemplation thereof. It was contended there, as here, that temporary stoppage of performance simply postponed deliveries and did not end the contract. The court said in 285 Fed., page 716:

''No sane business man would at that time have entered into a contract to buy, at war prices, material to supply the needs of his factory, to be delivered at specified periods in the immediate future, with the express agreement and understanding that if government regulations prevented the delivery of the material so purchased at the times named, or at any time during the continuance of the war, that the seller would have the right to deliver that material at one time and in one mass after the war had terminated, which event might be years in the future.''

The cases above mentioned are not inapplicable to the case at bar, or they at least shed considerable light upon the subject before us. It is true that we nowhere find a specific clause in the contract in the case at bar that it is ''subject

to the ability of obtaining transportation,'' or that the shipment was to be made ''ability to obtain transportation excepted.'' But it is conceded by plaintiff that the defendant was excused from the performance of the contract during a period of three years while an impossibility to deliver the lumber existed. The effect, at least, of this would seem to be the same as though the contract in the case at bar had contained an express casualty clause, excusing defendant from performance, if transportation could not be obtained. The question of course still remains whether that excuse was intended to be permanent or temporary. But the same question arises in interpreting any casualty clause whatever, and in any event—and that is as far as we need to decide—the rule that courts are not inclined to construe such clause as intended to give a temporary excuse only, unless that clearly appears, would seem to be applicable here, for the reasons upon which that rule is founded operate as strongly in the case at bar as in the cases cited.

2. It remains, therefore, to be considered as to whether it clearly appears that defendant should be excused temporarily only, and that must be determined from the writing of the parties and the surrounding circumstances. Great stress is laid, by counsel for plaintiff, on the fact that the unsettled conditions of transportation were known to and in contemplation of the parties. There are cases which hold that where in such case the contract does not provide that the promisor shall be relieved from responsibility if he is prevented from performance by reason of such conditions, he is not excused. Brevard Tannin Co. v. J. F. Mosser Co., (C. C. A.) 288 Fed. 725; The Harriman, 9 Wall. 161, 172, 19 L. Ed. 629; Smith v. Morse (1868) 20 La. Ann. 220; Balfour, Guthrie & Co. v. Portland, (D. C.) 167 Fed. 1010; Long Bros. Mfg. Co. v. Ft. Wayne Paper Co., (C. C. A.) 278 Fed. 483; N. P. R. Co. v. American Trading Co., 195 U S. 439, 49 L. Ed. 269, 25 Sup. Ct. 84. These are cases where the court held the contract to be an absolute, unconditional undertaking to perform at a definite or within a

reasonable time. But in the case at bar it is conceded that the contract was dependent upon the defendant obtaining transportation. That is, at least substantially, the gist of the concessions made and the theory upon which the case was tried. Plaintiff claims the right to recover because transportation became available in 1919. It would, evidently, not have claimed such right, had transportation not become available then, and would merely claim the right to recover whenever that event would occur, no matter at whatsoever distant date that might be. Of course, as stated before, parties have a right to make a contract to that effect, but it is not likely that they would do so in a transaction involving the purchase of a commercial commodity intended for immediate consumption, or consumption in the near future, as in the case at bar, and much less, it would seem, would they do so where the unsettled conditions are known, and the market is constantly shifting. See Edward Maurer & Co. v. Tubeless Tire Co., supra. The principle of law in the cases cited above and relied upon by plaintiff cannot, therefore, be applied in the case at bar, or at least cannot be considered as having any material bearing herein.

Nor does the correspondence of the parties clearly show that the kind of contract, contended for by plaintiff, was made. The offer made in the letter of February 14, 1916, contained the statement that defendant could not say just when the lumber could be delivered, owing to the demoralized condition of transportation on water. There is nothing in this statement inconsistent with the intent to deliver within a reasonable time. On March 6, 1916, Thomas, on behalf of defendant, wrote that in his judgment there was not a chance in a million to get transportation for the lumber from the mill to New York City. There is nothing in that statement to indicate that he intended to make a contract to be performed in an indefinite future. It is consistent with the claim that the contract should be considered cancelled whenever the impossibility

of obtaining transportation continued beyond a reasonable
time.    On March 24, 1916, Thomas wrote that the matter
of transportation was not yet clearing, and that he was
still endeavoring to arrange for it.    This letter is not in-
consistent with the intent to deliver within a reasonable
time.    On March 9, 1916, plaintiff wrote: ''It looks as
though the next shipment might be many months getting
here.''    But a delay of months, probably reasonable under
the circumstances, is a different proposition from a delay
of years.    Other letters in the record show that plaintiff
was urging Thomas to make endeavors to secure transpor-
tation and in fact made endeavors in that direction itself.
Thomas did the same.    The correspondence shows that the
latter apparently after having exhausted all efforts, wrote
to plaintiff urging the latter to buy a ship of its own.
Plaintiff countered, asking defendant to make such a pur-
chase, and offering to advance money to it in order to
enable it to do so.    Why all these efforts, this urging, if
time was not considered of importance and it was contem-
plated that three years or more might elapse before the
contract might be performed?    Counsel for plaintiff call
attention to a letter of Thomas of April 24, in which he
stated:

''There is no relief in sight, and will be none as long as
war lasts and even when it stops it will be two or three
years before we get back to normal conditions.''

This is the same letter in which Thomas urged plaintiff
to buy a ship of its own, so as to transport the lumber.
Counsel think that the foregoing statement shows that the
parties contemplated that the contract might be performed
after the lapse of three years.    We cannot concur in that.
It seems to us that, taking the letter as a whole, the re-
verse is true.    When Thomas went to the extent, as he did
in that letter, of suggesting that plaintiff should buy a
ship of its own, and that this was the only method of get-

ting the lumber, it would seem to indicate unmistakably
his thought that time was of the essence and that it was
imperative that the lumber should be transported at once
or not at all.  The foregoing letter was answered by plain-
tiff on May 1, stating that to buy a boat was out of the
line of its business and that it would just have to wait
until defendant would be able to get the lumber to plain-
tiff.   Then, after asking defendant to buy a boat and of-
fering to loan money for that purpose, the letter con-
tinues:

"There is little doubt but what the present conditions
will continue for at least three years if the war stopped
today and it may last five years, so it seems as though a
boat is a necessity that you people cannot be without.  We
are anxious to co-operate with you to get the lumber here
but we do not care to enter into the transportation busi-
ness, but believe a plan can be worked out which will en-
able you to buy your own boat, and get us the lumber.
* * * For you and for ourselves it is imperative that
we get more lumber in this direction as soon as possible
and we are willing to do all possible to help the cause
along."

We cannot agree that this letter indicates that the par-
ties contemplated that delivery of the million feet of lum-
ber might be made at a distant date.  We think the con-
trary appears therefrom.  It was "imperative," so the
letter indicates, that plaintiff should receive the lumber
"as soon as possible;" that because the war might last an
indefinite time, the defendant was under "necessity" to
buy a boat.  We cannot see how it could be shown more
clearly than by this letter that plaintiff did not want to
wait and did not expect to wait until after the war was
over before receiving the lumber, but that, on the contrary
it wanted the lumber at once, was willing to go to great
length to accomplish that result, and expected that result

to be accomplished through the defendant's purchase of a boat. Prior thereto, and on April 16, 1916, plaintiff, asking as to the outlook for transportation, stated that it expected to be out of some items of lumber, indicating that these items were intended to be supplied out of a new shipment to be made under the contract in question. This, too, clearly shows that plaintiff wanted the lumber at a time not far distant, and negatives all probability that it had in mind that it might be able to be supplied only in an indefinite future. And the state of mind of Thomas is clearly indicated in his letter of June 3, 1916, when he stated:

"It would be unreasonable to expect us to tie up indefinitely such a large amount of lumber and let it hang fire that way, running on into the future that way indefinitely for a number of years."

This letter, it is true, was written after he had offered to sell the lumber to Kirchman, with reasonable prospects that the offer would be accepted, but the very fact of making that offer, after having exhausted all efforts and means to get transportation, showed clearly that he did not expect to deliver the lumber to plaintiff at an indefinite time in the future, and the statement in the letter simply emphasizes that fact.

We must still, however, consider the letter of Thomas dated May 19, 1916, which is much relied on by plaintiff. This letter was supplementary to one of May 15, 1916. In the latter Thomas wrote:

"I have just received an offer to bring out all we have at the mill at $30.00 a M. landing at San Francisco. This I take would be too high for your purposes as there would have to be added $26.25 freight from Frisco to Patterson, which would make the lumber cost you there $86.25 per M. Wish you could stand that much."

On May 19, 1916, Thomas wrote that ''another sugges-tion and probable solution of the problem'' had occurred to him; that it was apparent that it was impossible to get transportation for the million feet direct from the mill to New York, via water; that to pay $30.00 freight from the mill to San Francisco and then, in addition, the freight-charge by railroad to New York, would make ''your cost price too high maybe to handle the lumber on the New York market in competition;'' that if plaintiff thought that a cost of $89.75 per M would be too high, then it might ''while these conditions obtain in their relation to New York make arrangements to take say 500,000 feet of the million and have it delivered to Chicago,'' and dis-tribute it in the market which could be reached from that city.

''There is hardly any question but the present condi-tions as they pertain to New York are going to last for a year or two and you say you will be soon sold out of sev-eral of the items you now have on hand, and why not take 500,000 feet for Chicago and get busy during the interim? The question arises, what are you going to do in the in-terim?''

This letter of May 19, 1916, undoubtedly has a tendency to substantiate the plaintiff's contention. But it was written at least six weeks after the contract was finally made, after all efforts to obtain water transportation had failed, and Thomas was, as he said, trying to find a ''solu-tion of the problem.'' It must be noticed that he offered the lumber, or rather 500,000 feet thereof, at $86.25 per M. in his letter of May 15, and at $87.75 in his letter of May 19, and not at $50.00 per M. according to the con-tract made in March. He stated that it was clearly im-possible to get transportation for *the* million feet direct from the mill to New York, and asked plaintiff to take 500,000 feet '' of the million'' at $87.75 per M. Defendant

had 1,500,000 feet of lumber at the mill, and hence Thomas, in the foregoing letters, seems clearly to have had in mind the identical lumber which plaintiff claims to have bought in March of that year. But as he asked plaintiff to take the lumber at $87.75 per M. rather than at $50.00 per M., the contract price, he clearly thereby, in this aspect of the letters, repudiated the contract altogether, instead of acknowledging its existence. Plaintiff, it is true, attempted to ignore this phase by its letter of May 26, in stating that while it would take the lumber, or rather a million feet instead of 500,000 feet, it was not taking it in place of the million feet bought in March; in other words it attempted, by ignoring the plain position taken by Thomas, to assume the attitude that the lumber referred to in the letters of May 15 and 19 had no relation to the previous transaction. But as has been seen, Thomas promptly repudiated that construction by his letter of June 3. We do not think that the mere fact that this letter was written when the sale to Kirchman was nearing completion, weakens that repudiation, for it was in absolute ·consistence with the position taken by Thomas in the letter of May 15, and at least partially consistent with his position taken in the letter of May 19,—that is to say, it was consistent in so far, at least, as 500,000 feet of lumber was concerned. Hence any acknowledgment of Thomas of the contract such as plaintiff claims was made, could in no event be said to apply to anything more than 500,000 feet of lumber. The statement in the letter of May 19, that the then conditions would last a year or two, and ''why not take 500,000 feet for Chicago and get busy during the interim'' implies that he was willing, or, perhaps, felt himself bound, to deliver the remainder, namely, 500,000 feet, even after the expiration of one or two years. Thus we have a condition where part of the letter repudiates any contract whatever with reference to the million feet of lumber, and part of it recognizes, apparently, a contract such as is sued on in the case at bar. The situation is anomalous and

creates a doubt. But bearing in mind that the letter was not a part of the contract itself, but is to be considered, at most, only as one of the surrounding circumstances, and that it was written in order to find a "solution for the problem" confronting the parties, which offered solution was not accepted, but repudiated by claiming that the purchase in March of the million feet of lumber was a separate transaction, and in view of the principle of law heretofore stated, we feel constrained to resolve the doubt in defendant's favor, and do not think that the expressions last referred to, used in this single letter, should, under the circumstances, be considered as establishing the contract sued on. No other letters, as we have pointed out, have a strong tendency to prove such contract, but are consistent with the position that the contract should be performed within a reasonable time, or with the position that it should be considered cancelled when the impossibility to obtain transportation continued beyond a reasonable time.

3.  The contract must accordingly be held to have contemplated that it should be performed, if at all, within a reasonable time, and not thereafter, and that three years is not a reasonable time. Plaintiff, therefore, has failed to establish the contract sued on. It is not necessary herein to determine just when such reasonable time expired. Plaintiff concedes that defendant did not become liable until 1919, and was not liable for non-performance in the meantime. Hence the point called to our attention by counsel for plaintiff that defendant placed itself in a position, in June, 1916, so that it could not perform would seem to be altogether immaterial. The plaintiff cannot be in a better position with respect to that fact than if it had treated the sale to Kirchman as a repudiation of the contract. If it had so treated it, the plaintiff could at most have sued upon an unconditional contract which was to be performed within a reasonable time, which it has not done in this case. It is said in 13 C. J. 655:

"If the promisee elects not to accept the renunciation and continues to insist upon the performance of the promise, as he may do, the contract remains in existence for the benefit and at the risk of both parties, and if anything occurs to discharge it from other causes, the promisor may take advantage of such discharge."

The plaintiff did not rely upon the renunciation. During nearly all the year 1916 it refused to do so, and in fact still refuses to do so by bringing this action in the present form. Even if the reasonable time had not expired when the sale to Kirchman was made, that event, namely, the expiration of such reasonable time, occurred thereafter, and before 1919. In Geipel v. Smith, supra, quoted in Andrew Miller & Co. v. Taylor & Co., 1 K. B. (1916) 402, 413, where it was contended that defendant abandoned performance too soon by sailing away it was said:

"If the defendants chose to run the risk, and in the event turn out right, they are in the same position as if they had waited a reasonable time and had then sailed away."

So in the case at bar, the defendant should not be placed in a worse position because it did not wait until the expiration of a reasonable time before selling to Kirchman, since it is conceded that defendant was excused from performance in any event till 1919, which was after the expiration of such reasonable time. Plaintiff does not predicate its right of action on the non-performance during that time, and we cannot, therefore, see how it can recover herein.

The judgment of the lower court should accordingly be affirmed and it is so ordered.

*Affirmed.*

POTTER, Ch. J., and KIMBALL, J., concur.