Elbert O. SOWERWINE, Jr.,
Appellant (Defendant),

v.

Glenn E. NIELSON and Donald C.
Schmalz, Appellees (Plaintiffs).

No. 83–36.

Supreme Court of Wyoming.

Oct. 12, 1983.

Elbert O. Sowerwine, Jr., pro se.

L.B. Cozzens, Billings, Mont., for appellees.

Before ROONEY, C.J., and THOMAS, ROSE, BROWN and CARDINE, JJ.

CARDINE, Justice.

This action involved a dispute over the correct location of the common boundary between Tract 54, owned by appellee (Nielson), and Tract 56, owned by appellant (Sowerwine). Appellee (Schmalz) was Neilson's lessee and sought damages. This appeal is from the judgment establishing the boundary as claimed by Nielson.

We will affirm.

Appellant, in his brief, states the issues as follows:

1. "Is the controlling boundary between the Sowerwine land and the Nielson land where the Plaintiffs [appellees] say it is or where the Defendant [appellant] says it is?"

2. "Were the Plaintiffs entitled to a Preliminary Injunction (which readily turned into a permanent injunction)?"

3. "Do either or both parties show actual, continuous use of the disputed property for at least the ten years minimum required by an Adverse Possession claim?"

4. "Were Defendant's rights to equal treatment maintained as guaranteed to every citizen under both the United States and Wyoming constitutions?"

## FACTS

Appellant acquired title to Tract 56 by deed dated July 23, 1956. Mr. Dohse acquired possession of Tract 54 by contract for deed in 1958. He transferred his interest to Elsie Gibbs in 1964, and she conveyed Tract 54 to appellee Nielson in 1965.[1] The correct location of the common boundary between Tracts 56 and 54 is in dispute. The North Fork of the Shoshone River runs in an east-west direction just north of what appellee claims is the correct boundary between the tracts. There was an old fence approximately 10 chains south of the river (one chain equals 66 feet). Mr. Dohse and all successive owners of Tract 54 testified that the fence was not a boundary fence, but separated irrigated land from non-irrigated grazing land. Appellant contended the fence marked the true common boundary between Tracts 54 and 56.

■■■■ A fence may establish the boundary between tracts of land if it is acquiesced in and recognized by each party as the boundary for a period of more than ten years. However, a fence may also be kept only for convenience of the parties or to separate pastures or irrigated meadow from grazing land. A fence kept simply for convenience (as held by the court in this case) has no effect upon the true boundary between tracts of land. *State v. Vanderkoppel,* 45 Wyo. 432, 19 P.2d 955 (1933).

Appellant relied upon the call to the river in the original survey of this area to support his claim. Appellee relied upon the location of the original northeast and southwest corners of Section 14 in the resurvey to support his claim.

At the time of trial it was undisputed that appellant held title to resurvey Tract 56 (which, in the original survey, was described as NE ¼ Section 14, T 52 N, R 104 W) and appellee[2] held title to resurvey Tract 54 (which, in the original survey, was described as E ½ SE ¼, SW ¼ SE ¼ Section 14, and NW ¼ NE ¼ of Section 23, T 52 N, R 104 W). The following drawing of the area is helpful.

Commencing in 1960, Mr. Dohse began grazing his horses in the area between the fence and river. He continued this use for the succeeding four years he owned Tract

1. In December 1965, Tract 54 was sold to Cowgill Agency, Inc., a Wyoming corporation in which appellee Nielson was a part owner. Appellee Nielson acquired full ownership of Tract 54 from Cowgill Agency, Inc. in March 1967.

2. Nielson will be referred to as appellee. Schmalz was also a party plaintiff below. He was awarded damages, but they are not at issue in this appeal.

54. Subsequent owners testified that they grazed livestock in this area until it was acquired by appellee in 1965. Appellee's foreman testified that he used the area for grazing livestock until it was leased in 1976 to Donald Schmalz who thereafter used it for the same purpose to the time of filing this case. All denied that appellant occupied or used the disputed area until 1977 and 1979, when lessees of appellant grazed livestock there.

Appellant testified that from the time he acquired Tract 56 in 1956, either he or his lessees occupied and possessed the disputed area exclusively and used it for grazing livestock. In 1977, appellant and his son began construction of a house south of the river. Prior to this, appellee had thought he owned the area to the river. Now he employed a surveyor to locate the common boundary between Tracts 54 and 56. From this time until trial there were confrontations and difficulties between the parties. Appellee's lessee built a fence. Appellant tore it down. Appellant filled in a ditch of said lessee, tore out forms, left gates open and pushed livestock out of the area. This action then was commenced by appellee May 21, 1980.

The original survey was conducted in 1883. In establishing the common boundary between Sections 13 and 14, the surveyor's field notes show that he commenced at the southeast corner of Section 14, traversed "bench land" 30 chains to "bottom land"; at 40 chains the ¼ corner was set; at 57 chains he crossed the North Fork of the Shoshone River (then called Stinking Water River); at 70 chains he crossed an east-west road; at 80 chains he set the northeast corner of Section 14.

Because of some rather large errors in the 1883 survey, a resurvey of the area was undertaken in 1908. The resurveyor found the original 1883 survey northeast corner and southwest corner of Section 14. He was unable to find the southeast corner of Section 14. Therefore, he began the resurvey from the southwest corner of Section 14, proceeded 80 chains east, and being unable to find the southeast corner, he set a stone marker at point 2 (southeast corner), Tract 54 (see drawing), then proceeded north, but was unable to find the ¼ corner; he continued in a northerly direction and found the 1883 survey northeast corner of Section 14. From this northeast corner, he surveyed back on a line south on the common line between Sections 13 and 14 setting corner 6, Lot 55; corner 2 of Tract 56 which is also corner 1 of Tract 54; corner 5 of Lot 55, and then tied into the southeast corner of Section 14 (see drawing, supra). The resurvey was intended to establish the claims of settlers on the land as they existed at that time. It was standard practice to consult those who claimed or were occupying the land, offer an opportunity to object or suggest, and then, considering all objections and suggestions, the U.S. Surveyor General would approve or disapprove the resurvey plat. In this case the resurvey plat was approved on October 28, 1910.

Three surveyors testified; two for appellee and one for appellant. All agreed that the resurveyor followed proper procedure in starting from a known corner and proceeding as he did. All agreed that the call to the river should be considered but was not the determining factor. All agreed that the ¼ corner and boundary between Tracts 54 and 56 as located by appellee was in the correct location according to the resurvey. Appellant contends that the resurvey is in error because the river is 47 chains north of the resurvey southeast corner of Section 14 when, according to the 1883 original survey field notes, it is shown as 57 chains north of this corner.

Appellant is a registered professional engineer. Both he and the surveyor he employed were allowed to testify fully and put their theory before the court. In essence, that theory was that their survey which began at a point 57 chains south of the river, which is approximately ten chains south of the resurvey southeast corner of Section 14, was correct because they located what they considered bottom land at 30 chains; the river at 57 chains, and what in

their opinion had once been a road at 70 chains. However, the northeast corner of Section 14 occurs at 90 chains or 10 chains too far north. Appellant was of the opinion that the surveyor had made a mistake in locating the northeast corner of Section 14 ten chains too far north.

One of appellee's surveyors testified that, starting at the northeast corner of Section 14 and surveying back, the North Fork Road was 10 chains from the northeast corner; corners 5 and 6 of Lot 55 were in correct position; bottom land appeared 30 chains from the southeast corner; the southeast corner was 80 chains from the northeast corner; that all of the calls were correct, with the exception of the call to the river, which was 47 chains north of the southeast corner of Section 14. He was of the opinion that the surveyor in the 1883 survey had made a mistake of 10 chains or that the river had moved from its 1883 location.

All three surveyors testified that during the 100-year period following 1883 the river had moved, appellant's own surveyor testifying as follows:

"Q. So it is within the realm of possibility that the river moved six hundred to six hundred and fifty feet, and that would explain the discrepancy that we have of the location of the river?

"A. That could, yes.

"Q. Okay. But you don't—you do not know whether that river moved or not, do you?

"A. I don't know that—how much the river may have moved. It appeared that it had moved some."

Appellant himself testified the river had not moved but was in the same place as in 1883, and that the call to the river (a natural monument) must control. If the river moved, or if the original surveyor made a ten chain error in locating the river, then all calls in the resurvey are consistent. If the river did not move and there was no error in locating the river, then the original northeast and southwest corners and all other monuments must be moved 10 chains

to accommodate the river as a natural monument.

## I

IS THE CONTROLLING BOUNDARY BETWEEN THE SOWERWINE LAND AND THE NIELSON LAND WHERE PLAINTIFFS SAY IT IS OR WHERE THE DEFENDANT SAYS IT IS?

The question stated above is as expressed by appellant in his pro se brief. To answer the question, we must determine whether we should accept the river (a natural monument) as most reliable and move all corners to conform to the call to the river; or, whether the call to the river should be disregarded if it is the only call inconsistent with all other monuments.

■ In the surveying parlance, a "monument" is a natural or artificial physical object on the ground which helps to establish a line. Natural monuments are such things as trees, rivers, stone outcroppings, creeks, and land features. Artificial monuments are such as fences, stakes, roads, and things placed by human hand. Generally, natural monuments are:

"* * * landmarks to which preference must be given, because the certainty which they afford excludes the probability of mistake. Ordinarily, a preference is given to natural objects over artificial monuments in determining boundaries, but natural objects cannot prevail when they are doubtful, and in that case recourse is had to artificial marks or monuments or other calls of an inferior degree of accuracy." *Duff v. Fordson Coal Co.,* 298 Ky. 411, 182 S.W.2d 955, 957 (1944).

■ Natural monuments are also denied preference over artificial monuments where there is evidence from which it appears that the surveyor was mistaken as to the position of the natural object called for. *Duff v. Fordson Coal Co.,* supra.

In this case, appellant relies upon the call in the original 1883 field notes to the North Fork of the Shoshone River, a natural monument, to support his contention that the correct boundary between Tracts 56 and 54

is ten chains south of the resurvey boundary. Evidence in the case immediately illustrates that the call to the river is doubtful. The surveyors were of the opinion that the river had moved during the 100-year period following 1883. Appellant's own surveyor was of the opinion that the river could have moved as much as 650 feet. It is common knowledge, especially in the west where heavy snows can accumulate in the mountains, that unusual spring runoffs may substantially change the location of streams and rivers. Thus,

> " * * * the rule has been established that there is no presumption that monuments mentioned in a deed as occupying the bank of a river are intended by the parties as being exactly located and as standing at the water's edge. * * * " 12 Am. Jur.2d Boundaries § 27.

In *Thornton v. Headrick,* Miss., 50 So.2d 907 (1951), the original survey field notes described the ¼ corner as located by a cherry tree twenty inches in diameter on the bank of a small creek. One hundred years later, the cherry tree could not be located but there was an ironwood tree on the bank of the small creek. Appellant claimed that this was the tree and creek described in the original survey. The court stated, quoting another case, that,

> "the fact that a survey now made does not precisely check with the location of a stream as shown on the field notes a hundred years old is not enough to discredit the present survey." 50 So.2d at 909.

In *White v. Luning,* 93 U.S. 514, 23 L.Ed. 938 (1876), the Supreme Court determined that if the call along the north boundary of the rancho Sal Si Puedes on the northerly range of mountains was retained as true, there would be a conflict with all remaining courses and distances and all subsequent monuments mentioned in the description. The Court noted, however, that rejecting this call resulted in all other calls, monuments, courses, and distances to be completely in harmony and found,

> " * * * the conclusion irresistible, that the words of the call * * * were mistakenly inserted, and should be rejected * * * ." 93 U.S. at 526.

Uncertainty must yield to certainty and, if all lines and monuments and calls are consistent except one, the inconsistent call should be disregarded.

To accept appellant's position that some point on the bank of the river is the correct natural monument which must be given precedence, would require that all other corners and boundaries be moved ten chains south and relocated. Lands of numerous other owners in this area would be affected and under such circumstances, as we stated in *Hudson v. Erickson,* 67 Wyo. 167, 216 P.2d 379 (1950), we should not disturb and make uncertain the location of boundaries of numerous other parcels of land. In this case, the only inconsistent call was the one to the river. It was properly rejected.

The resurvey was commenced in 1908 and the field notes disclose that the original northeast corner and southwest corner of Section 14 were found in place by the resurveyor. The government survey was an official survey resulting in the preparation of a resurvey plat which was approved by the U.S. Surveyor General October 28, 1910.

In *Hudson v. Erickson,* supra, we stated that it will always be presumed, in the case of official surveys, that the surveyor did his duty and that his work was accurate.

And, in See *Ben Realty Co. v. Gothberg,* 56 Wyo. 294, 109 P.2d 455 (1941), we stated:

> "It is a general rule that the original corners as established by the government surveyors, if they can be found, * * * are conclusive on all persons owning or claiming to hold with reference to such survey and the monuments placed by the original surveyor without regard to whether they were correctly located or not. * * * " 109 P.2d at 460.

Appellee's expert witness surveyors testified that the resurvey accurately located the original northeast quarter of Section 14 as it existed on the ground and designated it Tract 56; that the east half of the southeast quarter was accurately located on the

ground as it existed in the original survey and was designated part of Tract 54; that the boundary between resurvey Tracts 54 and 56 is the same boundary in the same location as established in the original survey and had been accurately established by them according to that survey.

Appellant's surveyor expert testified that he had not formed an opinion as to whether or not the resurvey was accurate in locating the boundary line as originally established. He stated he would require a week of work to reach a conclusion. We note that the trial of this case commenced June 17th, was continued to July 23rd, then reset for August 21st, and concluded on that date. Appellant's surveyor had ample time to complete his work and form an opinion but failed to do so. Appellant himself expressed his opinion that the resurvey was not accurate and did not reestablish the boundary according to the original survey, thus creating a disputed question of fact to be resolved by the trial court.

The judge who presided at the trial heard and saw the witnesses. He is in the best position to determine questions of credibility and weigh and judge the evidence, both expert and non-expert. Thus, on appeal, it is a firmly established and oft-stated rule that we must accept the evidence of the successful party as true, leave out of consideration entirely the evidence of the unsuccessful party in conflict therewith, and give to the evidence of the successful party every favorable inference that may fairly and reasonably be drawn from it. Considering the evidence in this case in the light of these rules, it is apparent that the findings and judgment of the trial court must be sustained unless clearly erroneous or contrary to the great weight of evidence. *Albin Elevator Co. v. Pavlica,* Wyo., 649 P.2d 187 (1982); *City of Rock Springs v. Police Protection Ass'n,* Wyo., 610 P.2d 975 (1980).

The court resolved the conflicting testimony of the experts and other evidence in favor of appellee, holding that the correct boundary between Tracts 56 and 54 was as established by the resurvey; that

the resurvey boundary was identical to the boundary established between the NE ¼ of Section 14 and the E ½ SE ¼ of Section 14 in the original 1883 survey. There was substantial evidence to support the finding of the trial court, and it will not be disturbed on appeal.

## II

WERE THE PLAINTIFFS ENTITLED TO A PRELIMINARY INJUNCTION (WHICH READILY TURNED INTO A PERMANENT INJUNCTION)?

Appellant was represented capably by counsel in the trial court. The pleadings indicate that appellee initially sought a preliminary injunction which was resisted by appellant's counsel. The hearing commenced on June 17, 1980, testimony was taken, and the court took the application for preliminary injunction under advisement. The trial was then continued to August 21, 1980, at which time it was concluded, except for damages, by entry of partial judgment. The partial judgment, entered March 23, 1981, stated in part:

" * * * The Court having heard the evidence of the parties regarding said Application for Preliminary Injunction in a hearing commencing on June 17, 1980, and having taken said Application for Preliminary Injunction under advisement; and having set this matter for trial to commence on August 21, 1980 * * *."

Thus, a preliminary injunction was never issued by the court. No order or judgment affecting the rights or title to the land in dispute was entered until the partial judgment of March 23, 1981. Appellant, who appeared in this court pro se, may have misunderstood the effect of the court's orders. In any event, there being no preliminary injunction issued, there could be no error and we need not consider this further.

## III

DO EITHER OR BOTH PARTIES SHOW ACTUAL, CONTINUOUS USE OF THE DISPUTED PROPERTY FOR AT

LEAST THE TEN YEARS MINIMUM REQUIRED BY AN ADVERSE POSSESSION CLAIM?

Appellant asserts that irrespective of the survey, he acquired title to the disputed area south of the river by adverse possession.

■■■ We stated in *Farella v. Rumney,* Wyo., 649 P.2d 185 (1982), that,

"The elements of adverse possession consist of actual, open, notorious, exclusive, and continuous possession of another's real property for the statutory period, which possession is hostile and under claim of right or color of title. * * * " 649 P.2d at 186.

Section 1–3–103, W.S.1977, provides that these elements must exist for at least ten years prior to commencement of an action affecting title to or possession of the property. The party claiming title by adverse possession carries the burden of proof as to each of the elements for the statutory period.

Appellant testified that commencing in 1956, when he first acquired title to Tract 56, and for each succeeding year, he grazed livestock on the disputed area when grass was available. He produced witnesses who testified that commencing in 1977 and thereafter they moved cattle into the disputed area and grazed there until the feed was gone. This dispute between these parties arose in 1977.

Appellee detailed his use of the property for grazing each year commencing with Mr. Dohse in 1960. Appellee also produced witnesses who testified to grazing the disputed area to the date of trial. Both parties agreed that the land in dispute could not be cultivated and that there was not sufficient grazing for more than a few months each year. We have held that if a claimant occupies land and makes the only practical use of it for which it is suited, that is sufficient to satisfy the requirement of continuous possession. *Shores v. Lindsey,* Wyo., 591 P.2d 895 (1979); *Albin Elevator Co. v. Pavlica,* supra.

■■■ Both parties offered proof that they occupied and grazed the disputed area for more than the required period of time. The court apparently also resolved this conflict in the evidence against appellant. In any event, accepting the evidence of the prevailing party (appellee) as true, as we must do, it is apparent that whatever possession appellant enjoyed in the disputed area, it was not *exclusive* as required for adverse possession. Thus, his claim for title by adverse possession must fail.

## IV

WERE DEFENDANT'S RIGHTS TO EQUAL TREATMENT MAINTAINED AS GUARANTEED TO EVERY CITIZEN UNDER BOTH THE UNITED STATES AND WYOMING CONSTITUTIONS?

Appellant contends that rights guaranteed to him under the constitution were denied in two respects.

He feels he was denied equal protection under the law because he was not allowed to testify "fully on all engineering matters, including surveying * * *." Appellant is a professional engineer, duly registered and authorized to practice his profession in the State of Wyoming. We have reviewed the record and the entire transcript of testimony and conclude that appellant was permitted to testify fully as to the call to the river, that the river had not moved, that the survey was not done according to established rules and in other respects. He testified both as the owner of Tract 56 and as a professional engineer and expert in this field. His testimony created a conflict in the evidence which was considered by the court and resolved against him.

We note, also, that appellant's argument of unconstitutionality is not supported by cogent authority. In this circumstance, ordinarily it would not be considered by us. However, in the special situation of this case, we have considered the argument and we find no denial of rights guaranteed to appellant by the constitutions of the United States and the State of Wyoming.

Appellant also complains that a witness who testified in his behalf, Mr. Martin, was

not "afforded equal treatment under the law." Specifically appellant states that Mr. Martin was "pressed" more severely on cross-examination than other witnesses and that reference was made to Mr. Martin's being 73 years of age.

An attorney is an advocate, whose duty is to zealously represent his client to the best of his ability within established rules and under the supervision of the court. Cross-examination can be difficult, even severe. It is so intended, for on direct examination, considerable freedom in testifying is allowed. On cross-examination that testimony is scrutinized for accuracy, the opportunity to observe, foundation, bias, interest and motive. In this case Mr. Martin testified to the existence of a road at the time of the original 1883 survey. It was proper to establish that Mr. Martin was 73 years of age, and thus could not testify of his own knowledge that the road existed at the time of this survey because he had yet not been born. It is true he became confused on cross-examination. That can happen.

Trial judges are experienced. They observe witnesses in many situations, make allowances for them and accord weight to their testimony as is appropriate. We could discern nothing unfair or improper that occurred with respect to the taking of testimony. Neither was there a denial of rights guaranteed by the constitutions of the United States and the State of Wyoming.

Upon all the evidence in the case, the judgment of the court, therefore, is affirmed.