In the Matter of the ESTATE OF Marie J. BELL, Deceased.

John MORRIS and Norma Morris, Appellants, (Defendants and Crossclaim Defendants),

Joe Bell, et al. (Defendants),

v.

Joe BELL and Ray Bell (Counterclaim and Crossclaim Plaintiffs),

v.

The FIRST NATIONAL BANK & TRUST COMPANY OF WYOMING, nka Norwest Bank—Cheyenne, as Testamentary Trustee Under the Last Will and Testament of John H. Bell, Deceased, Appellee (Plaintiff),

The First National Bank & Trust Company of Wyoming, nka Norwest Bank—Cheyenne, as Testamentary Trustee of the Bell Trust under the Last Will and Testament of John H. Bell, Deceased; et al., Appellees (Counterclaim Defendants),

First Wyoming Bank, N.A.—Cheyenne, as personal representative of the Estate of Floyd T. Hale, deceased, R.O. Corporation, and Melvin Wright, Appellees,

Mary Gergen, et al. (Counterclaim Defendants),

DePaul Hospital, et al. (Crossclaim Defendants).

In the Matter of the ESTATE OF Marie J. BELL, Deceased.

DePAUL HOSPITAL, Appellant, (Defendant and Crossclaim Defendant),

Joe Bell, et al (Defendants),

v.

Joe BELL and Ray Bell (Counterclaim and Crossclaim Plaintiffs),

v.

The FIRST NATIONAL BANK & TRUST COMPANY OF WYOMING, nka Norwest Bank—Cheyenne, as Testamentary Trustee Under the Last Will and Testament of John H. Bell, Deceased, Appellee (Plaintiff),

The First National Bank & Trust Company of Wyoming, nka Norwest Bank—Cheyenne, as Testamentary Trustee of the Bell Trust under the Last Will and Testament of John H. Bell, Deceased; et al., Appellees (Counterclaim Defendants),

First Wyoming Bank, N.A.—Cheyenne, as personal representative of the Estate of Floyd T. Hale, deceased, R.O. Corporation, and Melvin Wright, Appellees,

Mary Gergen, et al. (Counterclaim Defendants),

Mrs. Kenneth Bell, et al. (Crossclaim Defendants).

In the Matter of the ESTATE OF Marie J. BELL, Deceased.

Joe BELL and Ray Bell, Appellants, (Defendants, Counterclaim and Crossclaim Plaintiffs),

Larry Jordan, et al. (Defendants),

v.

The FIRST NATIONAL BANK & TRUST COMPANY OF WYOMING, nka Norwest Bank—Cheyenne, as Testamentary Trustee Under the Last Will and Testament of John H. Bell, Deceased, Appellee (Plaintiff),

The First National Bank & Trust Company of Wyoming, nka Norwest Bank—Cheyenne, as Testamentary Trustee of the Bell Trust under the Last Will and Testament of John H. Bell, Deceased; et al., Appellees (Counterclaim Defendants),

First Wyoming Bank, N.A.—Cheyenne, as personal representative of the Estate of Floyd T. Hale, deceased, R.O. Corporation, and Melvin Wright, Appellees,

Mary Gergen, et al. (Counterclaim Defendants),

DePaul Hospital, et al. (Crossclaim Defendants).

In the Matter of the ESTATE OF Marie J. BELL, Deceased.

ST. JOSEPH'S ORPHANAGE, nka St. Joseph's Children's Home, Appellant, (Defendant and Crossclaim Defendant),

Joe Bell, et al. (Defendants),

v.

Joe BELL and Ray Bell (Counterclaim and Crossclaim Plaintiffs),

v.

The FIRST NATIONAL BANK & TRUST COMPANY OF WYOMING, nka Norwest Bank—Cheyenne, as Testamentary Trustee Under the Last Will and Testament of John H. Bell, Deceased, Appellee (Plaintiff),

The First National Bank & Trust Company of Wyoming, nka Norwest Bank—Cheyenne, as Testamentary Trustee of the Bell Trust under the Last Will and Testament of John H. Bell, Deceased; et al., Appellees (Counterclaim Defendants),

First Wyoming Bank, N.A.—Cheyenne, as personal representative of the Estate of Floyd T. Hale, deceased, R.O. Corporation, and Melvin Wright, Appellees,

Mary Gergen, et al. (Counterclaim Defendants),

DePaul Hospital, et al. (Crossclaim Defendants).

Nos. 86–62 to 86–65.

Supreme Court of Wyoming.

Aug. 18, 1986.

Reconsideration Denied Oct. 8, 1986.

William D. Bagley, of Rooney, Bagley, Hickey, Evans & Statkus, Cheyenne, for appellants John N. and Norma Morris.

Thomas N. Long, of Hirst & Applegate, Cheyenne, for appellant DePaul Hosp. and John J. Maier, Torrington, for appellant St. Joseph's Orphanage, nka St. Joseph's Children's Home.

Walter M. Kelly, II and Phillip C. Gans, of Cogswell and Wehrle, Denver, Colo., and Vincent J. Horn, Jr., Cheyenne, for Joseph Bell and Ray Bell.

Richard P. Boley, of Lathrop & Uchner, P.C., Cheyenne, for appellee The First Nat. Bank & Trust Co. of Wyoming, nka Norwest Bank—Cheyenne, as Testamentary Trustee of the Bell Trust Under the Last Will and Testament of John H. Bell, Deceased.

Frederick G. Loomis, of Loomis, Lazear, Wilson & Pickett, Cheyenne, for appellee The First Nat. Bank & Trust Company of Wyoming, nka Norwest Bank—Cheyenne, as Personal Representative and Testamentary Trustee of the Estate of Marie J. Bell, Deceased.

Stanley K. Hathaway and Rick A. Thompson, of Hathaway, Speight and Kunz, Cheyenne, for appellees, Estate of Floyd T. Hale, R.O. Corp. and Melvin Wright.

Before THOMAS, C.J., and BROWN and CARDINE, JJ., and GUTHRIE and RAPER, JJ., Retired.

BROWN, Justice.

In a complex case involving mutual and reciprocal wills, we are asked to examine the judgment rendered by the district court. Four appeals have been effected to this court and we have consolidated them for disposition.

First National Bank and Trust Company of Wyoming (now Norwest Bank of Cheyenne, Wyoming, N.A., hereinafter Norwest) as testamentary trustee of the estate of John Bell, filed a declaratory action to resolve disputes concerning the interpretations of the wills of John H. Bell and Marie Bell. The declaratory judgment action was joined with the probate of the will of Marie Bell. Thereafter, various beneficiaries under the wills filed numerous counterclaims and cross-claims to settle their various legacies.

Numerous issues have been raised by the parties on appeal. We have consolidated and condensed the issues into three main areas:

I

Whether the trial court was correct in holding the mutual, reciprocal wills of John Bell and Marie Bell were not made pursuant to an agreement.

II

Whether the trial court was correct in determining the tax apportionment issues.

III

Whether the trial court erred in determining the basis for the option price to be paid by John and Norma Morris. We will affirm.

On November 5, 1971, John Bell and Marie Bell executed their wills. The wills were prepared by their attorney James O. Wilson. The wills were identical except for name changes, and were executed as separate documents. The wills do not contain any agreement or reference to any agreement that the wills would be irrevocable by either maker.

John Bell and Marie Bell, husband and wife, were very successful ranchers and amassed a substantial estate consisting of several ranches and other property. The primary beneficiaries under the wills are John and Norma Morris. Norma Morris is the niece of John and Marie Bell. The Morrises worked closely with the Bells in the ranching operations. As a result, the Morrises were given the option of purchasing the John H. Bell Iron Mountain Ranch Company for fifty percent of its appraised value.

John Bell died on September 30, 1972, and his estate was probated. Under his will, all estate taxes were to be borne by the residuary estate. Fifty percent of the adjusted gross estate went to Marie Bell and the remainder was put into the Bell Trust for the benefit of Marie during her lifetime.

Between March 25, 1974, and July 3, 1980, Marie Bell executed five separate codicils. The second, third and fourth codicils were each specifically revoked by the fifth codicil, leaving only the first and fifth codicils to Marie Bell's will. The codicils were also drafted by the Bells' attorney.

Marie Bell died on October 16, 1983. On October 28, 1983, Norwest filed for the admission of Marie Bell's will and the codicils to probate. Questions were raised by various parties to this action about the effect of the will and subsequent codicils thereto. Therefore, Norwest filed an action for a declaratory judgment. Questions were raised regarding the validity of the codicils and whether the wills were executed pursuant to an agreement between John Bell and Marie Bell not to change their wills. Appellants Joe Bell and Ray Bell (brothers of John Bell), joined by John and Norma Morris, as well as DePaul Hospital and St. Joseph's Orphanage, contend the wills were made pursuant to an agreement. Appellants Joe Bell and Ray Bell also ask whether the court erred in its determination of the option price to be paid by John and Norma Morris for their legacy under the will. Further issues have been raised by DePaul Hospital and St. Joseph's Orphanage regarding tax apportionment.

## I

The first issue we will address is whether the trial court erred in finding that appellants failed to meet their burden of proving the wills were executed pursuant to a binding contract or agreement for the distribution of the assets of the estate.

The trial court determined that the wills were mutual and reciprocal. We defined the terms "joint wills," "reciprocal wills," and "mutual wills" in *Shook v. Bell*, Wyo., 599 P.2d 1320, 1321 (1979):

"Although the courts have not been uniform in their use and definitions of the terms, we define 'joint' wills, 'reciprocal' wills, and 'mutual' wills as follows: A 'joint' will is a single testamentary instrument constituting or containing the wills of two or more persons and jointly executed by them. 'Reciprocal' wills are those in which each of two or more testators makes a testamentary disposition in favor of the other. 'Mutual' wills are two or more separate instruments, each executed by separate testators and manifesting a common intention to dispose of their property in a particular manner. *We do not include as part of the definition of a mutual will, as some courts do, the elements of execution by each testator pursuant to an agreement, each in consideration of the other.* 1 Bowe-Parker: Page on Wills, §§ 11.1 and 11.3; 97 C.J.S. Wills § 1364e(1); 79 Am. Jur.2d, Wills, § 754. * * *" (Emphasis added.)

It is important to note at the outset of our discussion that our definition of mutual wills does not include the element that such wills are made pursuant to an agreement. As noted earlier, the wills of John Bell and Marie Bell are identical except where differences in gender, relationship, or context require otherwise.

Sometime after John Bell's death in 1972, Marie Bell became concerned with certain provisions of her will, prompting her to consult with her attorney, Mr. Wilson, as well as Edwin L. Patrick, trust administrator for Norwest. The purpose of this first codicil was explained by Mr. Patrick as follows:

"The First Codicil was probably initiated by Mr. Wilson and myself at the time that it became apparent that our value, our appraised value for probate purposes and the federal estate tax values in John Bell's Estate were going to be different figures because of the Internal Revenue Service's nonacceptance of the probate values for federal estate tax purposes.

The words of 'appraised value' in the wills, and it became apparent that we had to establish the intent of the testators and attempt to clarify which of those two values would be utilized in the calculation of the option price."

The first codicil directed that the option price paid by John and Norma Morris be based on the 1972 appraised values of John Bell's estate. Marie Bell also executed the second, third and fourth codicils later, but revoked them all when she executed the fifth codicil, which significantly altered the estate plan under the mutual, reciprocal wills.

The fifth codicil changed many specific bequests by deleting some legatees and adding others. The debt owed on ranches sold to several Bell employees was forgiven under the fifth codicil, and other lands were devised to the employees. Furthermore, the fifth codicil set forth specific lands to be included in the property available to the Morrises under their option.

One asserting the existence of a contract in order to recover on it has the burden of proving it. *Miller v. Miller*, Wyo., 664 P.2d 39 (1983); and *Black & Yates, Inc. v. Negros-Philippine Lumber Co.*, 32 Wyo. 248, 231 P. 398, 37 A.L.R. 1487 (1924). One authority states:

"The burden of proof of a contract for the execution of wills containing reciprocal bequests is upon the party who claims under and asserts such a contract as the basis of his cause of action. * * *

"The burden of proof that wills strictly reciprocal in their provisions were executed in pursuance of a contract between the testators rests upon the contestant in a will contest wherein the ground of contest is that the propounded instrument became inoperative as the will of the surviving testator upon the death of the other testator." 79 Am.Jur.2d Wills § 803, p. 858 (1975).

No one contends that there is a written agreement in existence whereby John Bell and Marie Bell executed their wills. The only evidence regarding such agreement, if any, infers a possible oral contract between the Bells.

In the case of an oral contract, the party seeking to establish the existence of the contract has a heavy burden. *Pangarova v. Nichols*, Wyo., 419 P.2d 688 (1966); and *Slover v. Harris*, 77 Wyo. 295, 314 P.2d 953 (1957).

"Courts accept with caution and examine with scrutiny evidence offered in support of a contract to make a disposition of property of a deceased person different from that provided by law. * * * A high order of proof is required to sustain such contracts, and the claimant is held to a strict proof thereof, and the evidence must establish that the minds of the parties met on definite terms." 94 C.J.S. Wills § 113(2), pp. 868–869 (1956).

The rule in this state is that the mere execution of mutual, reciprocal wills does not, in and of itself, prove the existence of an agreement between the testators. But such an agreement may appear by express reference thereto in the wills, or by inference. *Shook v. Bell, supra*, at 1324.

"The fact that joint wills and mutual wills are usually executed as the result of a common intention does not in any way mean that they are always executed pursuant to a contract between the parties respecting the making of such wills. * * * The sole fact, standing alone, that two wills were executed at or near the same time and bear similar provisions should in no way give rise to a presumption or an inference that they were made pursuant to a contract." 1 Bowe-Parker: Page on Wills § 11.1, p. 554 (1960).

In the early case of *Canada v. Ihmsen, et al.*, 33 Wyo. 439, 448, 240 P. 927, 929, 43 A.L.R. 1010 (1925), this court stated:

"The great weight of authority is to the effect that mutual wills, made by separate instruments, do not afford sufficient evidence that the wills were made pursuant to a contract, and that hence, if the contract is shown at all, oral evidence is necessary. [Citations.] * * * "

The wills of John Bell and Marie Bell fail to recite or make reference to such an

agreement. John and Norma Morris testified they believed there was an agreement between the Bells. The trial court classified the testimony regarding the alleged terms of the agreement as "vague and nonspecific, as was testimony regarding the conversations upon which that belief was founded." In a comprehensive memorandum opinion, the trial court summarized the testimony regarding the alleged existence of an agreement:

"* * * For example on cross-examination by Mr. Speight, Norma Morris testified as follows beginning at page 313 of the transcript concerning the alleged agreement between John and Marie Bell:

"'Q. Is it a fair statement, Mrs. Morris, that the meeting of the minds that you just spoke of is really embodied in the two wills that were written in 1971?'

"'A. Yes.'

"'Q. * * * [I]t's correct, is it not, that you do not recall any specific conversations wherein John Bell said to Marie Bell or Marie said to John, "we will not change our wills"?'

"'A. No, I cannot recall a conversation exactly like that.'

"Similarly Mr. Patrick, the trust administrator and John Sherman, the accountant, both testified that the Bells had agreed upon the common scheme or plan contained in the wills; however, both Mr. Patrick and Mr. Sherman were unaware of any irrevocable contract or agreement or reference to the same in the wills to allow all of the Bell property to pass as outlined in the original wills. Mr. Patrick, who was present when the drafted wills were read and explained the wills to John and Marie Bell for their approval, testified as follows:

"'Q. Okay. In summary, Mr. Patrick, would you say that the Bells, when they executed their wills, had a common plan, intent and scheme as to how to dispose of their estate? (Objection by counsel, overruled by the Court).'

"'A. I believe there was a common plan at that time, yes.'

"'Q. A common scheme, a common intent?'

"'A. I believe there was an agreement on it.'

"Later, during cross-examination by Mr. Hathaway, in relation to testimony, Patrick testified:

"'Q. Was there any discussion held that the wills could not be revoked but with the unanimous consent of Mr. and Mrs. Bell?'

"'A. There was no discussion that I recall at all along the lines of that.'

"'Q. Was there any separate written agreement saying that either Mr. or Mrs. Bell could not change their wills?'

"'A. There was none that I know of.'

"'Q. Was there anything written into those wills that said they could not change them?'

"'A. Not that I am aware of.'

"'Q. And you heard no discussion that any time prior or during execution of the wills that they were irrevocable?'

"'A. I recall none.'

"Later, also on cross-examination by Mr. Hathaway, with regard to the codicils executed by Marie Bell, Patrick stated:

"'Q. Now, with respect to your administration of Marie Bell's estate you carried it out entirely based upon the assumption that her unrevoked codicils were proper?'

"'A. That's correct.'

"'Q. And were not—did not violate any agreement that you had any knowledge of?'

"'A. That's correct.'

"'Q. And that you know of no written agreement preventing the codicil?'

"'A. That's correct.'

"John Sherman testified as follows on cross-examination by Mr. Bagley with regard to the Bells' estate planning process:

"'Q. And did they then arrive at an agreement for distribution of the estate of the first of them to die?'

"'A. Yes.'

"'Q. And did they arrive at an agreement for distribution of the second or survivor of them to die?'

"'A. Yes.'

"'Q. And then did they execute the wills pursuant to those agreements?'

"'A. I believe they did.'

"In response to questions by Mr. Hathaway on cross-examination Mr. Sherman further testified:

"'Q. Now, you have testified that there was a common plan or scheme for the distribution of the estate; that was on the date that the November, 1971, wills were executed that you are speaking of?'

"'A. Yes.'

"'Q. On that date the parties arrived at how they were—what wording they were going to have in their wills, didn't they?'

"'A. Certainly.'

"'Q. Was there any wording in the wills that said they were—they were not—that they were irrevocable without the consent of the other?'

"'A. Not to my knowledge.'

"'Q. Were you aware of any written agreement to that effect?'    -

"'A. No.'

"'Q. Were you aware of any oral agreement to that effect?'

"'A. No.'

"'* * * * *

"'Q. So when we talk about a common plan, scheme, or whatever, it does not include a plan to have irrevocable wills, does it?'

"'A. I don't know—I don't know. I can't answer that, Mr. Hathaway, what they had in their minds.'"

In our review of the record, we also are unable to find the existence of an agreement. It should be remembered that the Bells were successful ranchers with an acumen for business. The wills were prepared under their direction by their attorney. If the Bells had wished that their wills be executed pursuant to an agreement, such a provision presumably would have been included in the wills by express reference thereto or by inference.

Marie Bell is not alleged to have been incompetent at any time pertinent to her execution of the codicils. We find the trial court was correct in holding that there was a failure in proving that the Bells executed their wills pursuant to an agreement. To hold otherwise would be tantamount to finding an agreement solely from the execution of mutual, reciprocal wills. This is not the law in this state.[1]

In the absence of such an agreement, a testator has the right to alter, amend or revoke his will. Wills are ambulatory in nature, and testators have the inherent right to revoke them until their death. In the absence of a contract, there is nothing to hinder a competent testator from changing his will as often and in any manner as he sees fit. *Canada v. Ihmsen, et al., supra.*

## II

The second issue we will address is whether the trial court correctly determined the tax apportionment issues. Appellants DePaul Hospital and St. Joseph's Orphanage apparently contend that the

---

1. Since we find there was no agreement, we need not consider the effect of such agreement under the statute of frauds. See, *e.g., Canada v. Ihmsen,* 33 Wyo. 439, 240 P. 927 (1925); 1 Bowe-Parker: Page on Wills § 10.10, et seq. (1960). Of further interest is the Uniform Probate Code, § 2–701, 8 U.L.A. 155 (1983), which reads:

"A contract to make a will or devise, or not to revoke a will or devise, or to die intestate, if executed after the effective date of this Act, can be established only by (1) provisions of a will stating material provisions of the contract; (2) an express reference in a will to a contract and extrinsic evidence proving the terms of the contract; or (3) a writing signed by the decedent evidencing the contract. The execution of a joint will or mutual wills does not create a presumption of a contract not to revoke the will or wills."

Uniform Estate Tax Apportionment Act, §§ 2-10-101 through 2-10-110, W.S.1977 (July 1980 Replacement), should govern the apportionment of estate taxes. Section 2-10-103 of the act provides, *"Unless the will otherwise provides,* the tax shall be apportioned among all persons interested in the estate." (Emphasis added.) See, e.g., *In re Hilliar's Estate,* Wyo., 498 P.2d 1237 (1972).

The testamentary intent of Marie Bell was expressed in her will as follows:

"* * * All estate taxes, federal and state, imposed by reason of my death, with respect to any property (whether disposed of by this will or not) required to be included in my gross estate for estate tax purposes, and interest or penalties thereon, shall be borne by my residuary estate. All legacy, succession, inheritance and like taxes (as distinguished from estate taxes), imposed by reason of my death on any property (whether disposed of by this will or not), and interest to penalties thereon, shall be borne by my residuary estate. So far as practicable and reasonable, my Executors shall pay as soon as convenient after my death any of the taxes referred to in the preceding sentence on future or contingent interests."

In the case of *In re Ogburn's Estate,* Wyo., 406 P.2d 655 (1965), we recognized that a testator or testatrix reserves the right to determine how the estate taxes shall be paid. We determined the purpose of the Uniform Estate Tax Apportionment Act:

"The statute accomplishes three general purposes. First, it preserves the inherent and recognized right of a testator or testatrix to designate the fund from which such taxes are to be paid. Secondly, it abrogates the common-law rule that, absent such a designation, the burden of payment was first to be imposed upon the residuary estate. Thirdly, and again absent a directive in the will to the contrary, it apportions the tax—without regard to special or general devises and bequests—commensurately to those ben-

efited by the gifts of property upon which the Federal tax has been imposed." Id., at 657.

It is well settled that directions against apportionment must be expressed clearly and unambiguously. In re Ogburn's Estate, supra. It seems clear that Marie Bell wished the estate taxes to be borne by her residuary estate. However, appellants claim Items 6 and 7 of Marie Bell's will further complicate the questions they raise. Item 6 provides:

"I authorize and direct my executors to include in the legacies provided for in Item 4 hereof sufficient liquid assets to pay all estate and inheritance taxes collectable with reference to my estate."

Item 7 provides:

"In the event my husband shall not survive me, then after making the payment of debts, administrative expenses, bequests and taxes provided for in ITEM 2, ITEM 4(12)(a), and ITEM 6, hereof, I give, devise and bequeath my entire estate to the First National Bank and Trust Company of Wyoming, in trust under the terms and provisions of trust provided for in ITEM 4 hereof."

Item 6 does not direct the manner of payment, only that sufficient funds shall be available to pay the taxes. Item 7 determines what course of action should be followed in the event Marie Bell's husband predeceases her, which was the case. It does not appear that Item 7 conflicts in any way with the tax apportionment language of Item 2. The trial court so held.

█ Appellants complain that their respective legacies are substantially reduced by such apportionment, which runs contrary to the intent of Marie Bell in her original will. That is true. But we have previously held that Marie Bell had the right to execute the codicils changing the provisions of her will. These codicils substantially affected the bequests to DePaul Hospital and St. Joseph's Orphanage. Edwin L. Patrick testified that Marie Bell understood the effect of tax apportionment upon her residuary estate.

We find the trial court was correct in its disposition of tax apportionment under the express provisions of Marie Bell's will, and not according to the Uniform Estate Tax Apportionment Act.

### III

The third issue we will address is whether the trial court erred in determining the basis for the option price to be paid by John and Norma Morris. Under the wills of John Bell and Marie Bell, the Morrises were granted an option to purchase the John H. Bell Iron Mountain Ranch Company for fifty percent of the appraised value. The applicable provisions of John Bell's will read as follows:

"*ITEM 4.* In the event my said wife survives me, I direct that from the remainder of my estate there first be paid all estate and inheritance taxes, and the balance thereof, I give, devise and bequeath to The First National Bank and Trust Company of Wyoming, in trust, to be known as the Bell Trust, for the uses and purposes, and with the powers and authority and subject to the limitations, conditions and provisions as follows:

"(1) To hold, manage, control, invest and reinvest the trust estate during the trust term, that is, for the life of my wife, Marie J. Bell.

"(2) To pay the entire net income of said trust to my wife, Marie J. Bell, in monthly or other convenient installments as long as she shall live.

  \*     \*     \*     \*     \*     \*

"(c) It is my desire, and that of my wife, that the real and personal property, including livestock, owned and held by the John H. Bell Iron Mountain Ranch Company and any contiguous real property or any real and personal property including livestock, owned by me but used in connection with the livestock and ranching operation of said corporation, be retained by the Trustee for not to exceed a two year period. The Trustee shall give and grant to John N. Morris and Norma Morris an exclusive option to purchase all of said property for fifty per cent (50%) of the appraised value of said property, including the corporate stock held by me in said corporation. Said option shall be exercised by the optionees prior to the expiration of said two year period, but in the interim period the Trustee shall continue to operate said ranch corporation.

"Included in said option shall be the original Iron Mountain Ranch first acquired by my wife and me, and located in Townships 18 and 19 North, Ranges 70 and 71 West, in Laramie and Albany Counties, Wyoming, consisting of approximately 7,000 acres, together with the related leases to said ranch with the United States of America and the State of Wyoming."

Marie Bell's will is identical to the above except for changes in gender.

On March 25, 1974, Marie Bell executed the first codicil which expressly directed that the option price be based upon the valuation of the inventory and appraisement of John Bell's estate. The codicil reads:

"I hereby amend ITEM 4, paragraph 12(c) of my last Will and Testament, dated the 5th day of November 1971, by adding the following to the first paragraph thereof, in line 25, page 7 following the word corporation.

"Due to the constant and ever increasing valuation of ranch properties, I have determined that my wishes and desires and that of my deceased husband, John H. Bell, may not be accomplished in keeping the John H. Bell, Iron Mountain Ranch Company together as a 'working cattle ranch', unless valuation thereof is stabilized. I direct, therefore, that my corporate stock in said ranch company and my interest in contiguous real property or any real and personal property including livestock, owned by me but used in connection with livestock and ranching operation of said corporation, be appraised at the same valuation as that determined in the Inventory and Appraisement of the estate of John H. Bell and as set over to the trust established by him in his Last Will and Testament. I direct that the

option granted John N. Morris and Norma B. Morris to purchase said ranch property for fifty percent (50%) of the appraised value of the ranch property, heretofore described and established by me in the Will, be the same as the values appraised in the Inventory and Appraisal of my husbands estate and as set over in the trust established by him in his Last Will and Testament at The First National Bank & Trust Company of Wyoming, Cheyenne, Wyoming, and in the same trust as established by me in this my Last Will and Testament.

"IN WITNESS WHEREOF, I have hereunto set my hand and seal this 25th day of March 1974."

In the fifth codicil executed July 3, 1980, Marie Bell again amended Item 4(12)(c) to add another ranch to the John H. Bell Iron Mountain Ranch Company to be purchased under the option:

*"THIRD.* I hereby further amend ITEM 4, 12(c) of my Last Will and Testament dated the 5th day of November, 1971, as amended by the First Codicil to said Last Will and Testament, dated March 25, 1974, by adding an additional paragraph following the words 'Last Will and Testament' of the Amendment to the First Codicil to the Last Will and Testament to read as follows:

> "The reference to 'the John H. Bell Iron Mountain Ranch Company and any contiguous real property or any real property owned by me but used in connection with the livestock and ranching operation of said corporation' is hereby amended to specifically include therein what is denominated by me as the Pascoe Ranch, described as follows:
> " * * * * *

"I have not specifically described in my Will or in the Codicils thereto, nor did my husband in his Last Will and Testament, the lands specifically included in the John H. Bell Iron Mountain Ranch Company, and since the Pascoe Ranch is not immediately adjacent to the above described ranch company, I have made this clarification which will allow John N. Morris and Norma Morris the option to purchase said ranch described therein."

■ As the first codicil states, the option price is to be based upon the 1972 appraised value of the inventory of John Bell's estate. The trial court so held:

" * * * Based upon the Court's previous rulings, it is its opinion that the first codicil to Marie Bell's will governs the value of these properties, dictating that the value be determined and appraised at the same valuation as that determined in the inventory and appraisement of the estate of John H. Bell. The Morris option allows the purchase of these properties for 50% of the appraised value. * * "

■ Various other issues have also been raised by some of the parties which we will address briefly. In answer to questions raised regarding jurisdiction, it is to be remembered that the declaratory judgment action was joined with the probate matters, and therefore, the trial court had jurisdiction to decide equitable matters as well as tax and other issues. See, e.g., *In re Estate of Lonquest,* Wyo., 526 P.2d 994 (1974). One of the parties, in passing, raised the question regarding finality of the trial court's order. However, we have difficulty identifying matters not disposed of in the final order. Insofar as we can tell, the "Judgment and Final Order" entered by the court was a "final order" disposing of the claims raised for purposes of appellate review. Rule 1.05, Wyoming Rules of Appellate Procedure.

■ Questions were also raised regarding the property devised to Floyd Hale and the R.O. Corporation by Marie Bell in her fifth codicil. This property was previously owned by John Bell and Marie Bell as joint tenants by the entireties. The trial court properly concluded that this property passed to Marie Bell at the time of John Bell's death, and " * * * was not subject to the will of the first person to die, since that property was held in joint tenancy, by the entireties." Therefore, this property was Marie Bell's to dispose of as she saw fit.

See, e.g., *Nussbacher v. Manderfeld*, 64 Wyo. 55, 186 P.2d 548 (1947). She saw fit to devise this property to Floyd Hale and the R.O. Corporation, and therefore, such was not subject to the option given to the Morrises.

We stated in *Sowerwine v. Nielson*, Wyo., 671 P.2d 295, 301 (1983):

"The judge who presided at the trial heard and saw the witnesses. He is in the best position to determine questions of credibility and weigh and judge the evidence, both expert and non-expert. Thus, on appeal, it is a firmly established and oft-stated rule that we must accept the evidence of the successful party as true, leave out of consideration entirely the evidence of the unsuccessful party in conflict therewith, and give to the evidence of the successful party every favorable inference that may fairly and reasonably be drawn from it. Considering the evidence in this case in the light of these rules, it is apparent that the findings and judgment of the trial court must be sustained unless clearly erroneous or contrary to the great weight of evidence. *Albin Elevator Co. v. Pavlica*, Wyo., 649 P.2d 187 (1982); *City of Rock Springs v. Police Protection Ass'n*, Wyo., 610 P.2d 975 (1980)."

Accordingly, we are unable to find any reversible error in the well-reasoned, comprehensive decision of the trial court in this complex case. Therefore, the decision is affirmed in all respects.

## ORDER DENYING MOTION FOR RECONSIDERATION AND PETITION FOR REHEARING

THOMAS, Chief Justice.

This case came on before the court pursuant to appellants Morrises' Motion for Reconsideration and Petition for Rehearing, and the court having carefully considered the same, finds that the court's original opinion affirmed the district court's decision in all respects. This includes, of course, the following portion of the district court's memorandum opinion regarding the extent of the Morrises' option:

## "EXTENT OF OPTION

"The defendants, John and Norma Morris, have additionally filed on November 22, 1985, a motion and/or petition for determining the extent of the exercised option granted John and Norma Morris by Item 4, paragraph 12(C) of the last will and testaments of John and Marie Bell. Morrises contend that the last wills and testaments of the Bells were finely-tuned instruments designed to favor the Morrises as beneficiaries, ensuring them that they would not be overburdened with debt in acquiring the Iron Mountain Ranch Properties. It will be the view of the Court that the motion of the Morrises should generally be denied; and the Court would further determine that the option granted to the Morrises extends only to the land and personal property, including livestock owned and held by the John H. Bell Iron Mountain Ranch Company and contiguous real property or any real and personal property, including livestock, owned by Marie Bell used in connection with the livestock and ranching operation of the corporation. The Court has previously ruled with regard to the question of a binding agreement existing by and between John and Marie Bell. My way of listing assets that are subject to the sale provisions to Mr. and Mrs. Morris, Exhibit I to the first interim report reflects those items from the Marie J. Bell estate. See page 000334.

Finally, as to property covered by the option, the Court will adopt the position taken by Norwest Bank in its memorandum dated December 5, 1985. This disposition among other things avoids the requirement that separate hearings be conducted as to individual items and further recognizes the Court's opinion concerning the issue of a binding agreement between John and Marie Bell."

Specifically, the Morrises now contend that there is personal property and pro-

ceeds from the property remaining in the Bell Trust not disposed of by the majority opinion. In the court's opinion, our rationale for affirming the trial court in its determination regarding the disposal of the real property under the Morrises' option, is also applicable to the disposition of the personal property, and we so held by affirming the district court in all respects. Therefore, it is

ORDERED that the Motion for Reconsideration and Petition for Rehearing be, and it hereby is, denied.